**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS,**
**AUSTIN DIVISION**

DAEDALUS PRIME LLC
      Plaintiff

v.

MARVELL TECHNOLOGY, INC.
      Defendant

Civil Action No.: 1:26-cv-00081-ADA

**DEFENDANT MARVELL TECHNOLOGY, INC.'S OPENING CLAIM**
**CONSTRUCTION BRIEF**

1

## I.    INTRODUCTION

Plaintiff Daedalus Prime LLC ("Daedalus" or "Plaintiff") asserts five patents against Defendant Marvell Technology, Inc. ("Marvell" or "Defendant"), each relating to multicore processor power management. Daedalus argues that the disputed claim terms need no construction and should be given their "plain and ordinary meaning." But that position does not resolve the parties' actual disputes and would leave the claims untethered from the way the patents define and describe the claimed technology. The intrinsic record—and, where appropriate, contemporaneous extrinsic evidence—supports specific constructions that give the disputed terms their proper meaning in the context of the patents and their disclosed inventions.

The disputed terms fall into two categories. First, the parties believe that seven terms require specific construction because the claim language, specifications, and, where appropriate, Plaintiff's infringement contentions and extrinsic evidence show that they have definite meaning tied to the disclosed inventions. Namely, "power controller" and "a first domain and a second domain" in the '316 Patent; "workload configuration regarding a workload" and "workload configuration value" in the '197 Patent; and "multi-threaded core," "first cluster," and "second cluster" in the '960 and '919 Patents.

Second, several claims of the '197 Patent use the phrase "is to" in a way that blurs the line between apparatus claiming and method-of-use claiming. Rather than merely reciting structural capability, those claims read as requiring the claimed system, processor, or medium to perform particular operations, creating uncertainty as to when infringement occurs and rendering them indefinite.

For the reasons set forth below, Marvell respectfully requests the Court to adopt its proposed constructions for the disputed terms and hold the asserted claims using the indefinite

"is to" formulation invalid.

## II.   FACTUAL BACKGROUND

This case concerns five patents[1] originally assigned to Intel Corp. The parties have proposed constructions for four of the patents,[2] which concern processor-level techniques for managing limited system resources, including power budgets, power-management settings, and the organization of cores and cache slices into clusters that may operate in different power-consumption states.

All four patents address a familiar problem in semiconductor processor design: modern systems have limited power and thermal headroom, so different parts of the processor must compete for finite resources. The patents describe different ways to manage those constraints.

The '316 Patent is directed to allocating a processor's overall power budget across multiple "domains" during runtime. Ex. A,[3] '316 Patent, Abstract. As the specification explains, modern processors increasingly include multiple functional domains that share a common power budget, but conventional systems purportedly lacked mechanisms to ensure that power is appropriately distributed among those domains based on workload. *Id*. at 1:22-26, 1:56-66. The '316 Patent describes determining a total power budget for a given time interval, allocating portions of that budget to different domains (e.g., a core domain and a graphics domain), and controlling the domains' operating frequency accordingly. *Id.* at Abstract. The allocation may be dynamically adjusted based on workload conditions (e.g., prioritizing a graphics domain for

---

[1] The asserted patents are U.S. Patent Nos. 8,769,316; 10,372,197; 10,705,960; 10,725,919; and 8,984,228. Marvell contends the patents are invalid because the claimed inventions are unpatentable under applicable statutory provisions, including as anticipated and/or obvious.
[2] No party has proposed constructions for any claim terms in the '228 patent.
[3] All exhibits referenced within are attached to the Declaration of Karineh Khachatourian in Support of Marvell's Opening Claim Construction Brief.

graphics-intensive workloads or a core domain for compute-intensive workloads). *Id.*; *see also id.* at 7:67-8:4.

The '197 Patent is directed to processor power management tuning based on the type of workload expected to be run on the system. *See* Ex. B, '197 Patent, Abstract, 6:61-7:14. The specification explains that, at the time of tuning, "there is little knowledge of the actual workload and usage pattern for the system in the field," causing the tuning to be conservative. *Id.* at 1:55-59. To address this, the '197 Patent describes embodiments in which, among other things, a "workload configuration input" may be provided so that different tuning-table entries can be accessed for different workload configurations. *Id.* at 6:61-7:14. That input is intended for users who have "an understanding and control of the exact workloads running on their systems" and want tuning settings that "favor a specific workload pattern," such as "non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive, etc." *Id.* at 6:67-7:7.

The '960 and '919 Patents are related patents directed to processors that have "virtually clustered cores and cache slices." Ex. C, '960 Patent, Abstract; Ex. D, '919 Patent, Abstract. In broad terms, the patents describe grouping logical processors and their corresponding cache slices into virtual clusters and directing certain cache accesses to the subset of distributed cache slices associated with the corresponding logical processor. Ex. C, Abstract; Ex. D, Abstract. This virtual clustering approach is also tied to power management. For example, the patents depict a "first virtual cluster" with a "higher power consumption state" and a "second virtual cluster" with a "lower power consumption state," explaining that the lower-power state may be achieved by reducing the cluster's voltage and frequency points. Exs. C, D, at Fig. 6, 12:17-22.

## III.    PROPOSED CONSTRUCTIONS

4

The following table identifies the terms being construed, each party's proposed constructions, and the patent claims in which each term appears.

| Claim Term | Patent Claims | Marvell's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|---|
| "power controller" | '316 Patent, claim 8 | "A hardware controller configured to control voltages and frequencies of a first domain and second domain of a multi-core processor." | Plain and ordinary meaning. |
| "a first domain and a second domain" | '316 Patent, claims 8-12 | "A first collection of hardware and/or logic and a second collection of hardware and/or logic, wherein each domain is configured to operate at different voltage and frequency points." | Plain and ordinary meaning, with the definition of "domain" being "a collection of hardware and/or logic that operates at the same voltage and frequency point." |
| "workload configuration input regarding a workload" | '197 Patent, claims 1-2 | "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g., non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive)." | Plain and ordinary meaning. |
| "workload configuration value" | '197 Patent, claim 15 | "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g., non-uniform memory architecture (NUMA), uniform | Plain and ordinary meaning. |

| | | memory architecture (UMA), input/output (I/O) intensive).” | |
|---|---|---|---|
| “is to” | '197 Patent, claims 2-3, 5-7, 9-10, 15-16, 18-20 | Indefinite. | Plain and ordinary meaning. |
| “multi-threaded core” | '960 Patent, claims 1, 15, 20;<br><br>'919 Patent, claims 1, 16, 21 | “A type of core that has hardware support for executing two or more threads at the same time/in parallel.” | Plain and ordinary meaning. |
| “first cluster” | '960 Patent, claims 1-2, 5-10, 15-16, 18-20;<br><br>'919 Patent, claims 1, 4, 6-12, 16, 18-22 | “A first group of a plurality of cores operating at a first voltage and a first frequency.” | Plain and ordinary meaning. |
| “second cluster” | '960 Patent, claims 1-2, 5-10, 15-16, 18-20;<br><br>'919 Patent, claims 1, 4, 6-12, 16, 18-22 | “A second group of the plurality of cores operating at a second voltage and a second frequency that are different from the first voltage and the first frequency, respectively.” | Plain and ordinary meaning. |

## IV.    ARGUMENT

### A.    Specific Constructions

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996). “The appropriate starting point [] is always with the language of the asserted claim itself.” *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). That language should be read first and foremost in light of the specification, which is “the single best guide to the meaning of a disputed term.” *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (citation omitted). The correct claim construction is the one that “stays true to the claim language and most naturally aligns with the patent's description of the invention.”

6

*Id.* at 1316 (citation omitted). The claim language, written description, and patent prosecution history thus form the intrinsic record that is most significant when construing a term. *Id.* at 1315–17; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Court may also consider extrinsic evidence if it "deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (citation omitted). But extrinsic evidence may not be used to contradict or change the meaning of claims. *Id.* at 1319 (citation omitted).

The Court's ultimate goal in construing claim terms is "giv[ing] the jury guidance that 'can be understood and given effect by the jury once it resolves the issues of fact which are in dispute.'" *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) (citation omitted). The jury must be able to "intelligently determine the questions presented." *Id.* (citation and internal quotation marks omitted). Thus, the plain and "ordinary meaning" of technical terms is only helpful when that meaning is "readily apparent even to lay [people]." *Phillips*, 415 F.3d at 1314.

### 1.    "power controller" ('316 Patent, claim 8)

| Claim Term | Marvell's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "power controller" | "A hardware controller configured to control voltages and frequencies of a first domain and a second domain of a multi-domain processor." | Plain and ordinary meaning. |

The Court should construe "power controller" as "a hardware controller configured to control voltages and frequencies of a first domain and a second domain of a multi-domain processor" in claim 8 of the '316 Patent.

Plaintiff's anticipated reliance on "plain and ordinary meaning" risks improperly

broadening the term. The critical issue is whether the "power controller" can be configured to control both the voltage and the frequency of the domains in a multi-domain processor. If the term is not construed, "power controller" may be read to be configured to only control one of either the voltage or the frequency. However, the '316 Patent claims and contemplates a "power controller" that is capable of controlling both.

(a)     *Claim 8 shows that the "power controller" is hardware.*

Claim 8 itself supports Marvell's proposed construction by showing that the "power controller" is a hardware component. The claim language itself is the starting point. *See Phillips*, 415 F.3d at 1312 (citations omitted); *see also Comark*, 156 F.3d at 1186.

Here, claim 8, a method claim, recites a "power controller of a multi-domain processor" that performs at least three functions: (1) "determining … a portion of the power budget to be allocated to the first and second domains," (2) "allocating a minimum reservation value to the first domain and … the second domain," and (3) "sharing a remaining portion of the power budget" according to sharing policy values. Ex. A, claim 8. Claim 8 further recites "controlling a frequency of the first domain and the second domain." *Id.* Read as a whole, the claim language describes a processor-resident control component that allocates power between processor domains and controls their operating states, including their frequencies. *Id.* Because frequency and power control are hardware-level specific processor operations, claim 8 uses the language of a hardware controller integrated within the multi-domain processor.

(b)     *Claim 1 supports that the "power controller" in claim 8 is configured to control voltage and frequency of the domains.*

Claim 1 of the '316 Patent, an apparatus claim, reinforces Marvell's proposed construction by confirming the patent's consistent use of the term domain that method claim 8's "power controller" governs. "Other claims of the patent in question, both asserted and

unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314 (citation omitted). For example, more detailed claims can inform the meaning of terms in a less detailed claim, and there is a presumption that the same term in different claims carries the same meaning. *See PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007); *see also Phillips*, 415 F.3d at 1314.

First, Claim 1 defines the "first domain" and the "second domain" as operating at independent voltage and frequency points. Namely, claim 1 recites "a multi-domain processor including a first domain and a second domain, each of the first and second domains to operate at an ***independent voltage and frequency***," as well as logic for allocating power between the domains. *Id.* at claim 1 (emphasis added).

Second, claim 8 uses the same "first domain" and "second domain" terms as referenced in claim 1. Specifically, claim 8 recites a "power controller" within a multi-domain processor, wherein the "power controller" is responsible for determining and allocating a power budget between the domains and controlling their frequencies. Ex. A, claim 8. This makes claim 1 a "valuable source of enlightenment" as to the "first domain" and "second domain" terms that claim 8's "power controller" manages. *Phillips*, 415 F.3d at 1314; *see also* Ex. A, claim 8. Thus, claim 1 confirms the nature of the "first domain" and the "second domain" that claim 8's "power controller" manages: *i.e.*, domains configured for independent voltage and frequency operation. *Id.* at claims 1, 8. In other words, claim 1 provides context for understanding the nature of the "first domain" and the "second domain" of the "multi-domain processor" referenced in claim 8, while claim 8 in turn identifies the "power controller" as the component responsible for managing those domains. *Id.* As such, reading claim 8 in light of claim 1 confirms that the "power controller" manages domains explicitly defined by their independent

voltage and frequency operating points. *Id.*

Additionally, by reading claim 8 in light of claim 1 in this manner, it appropriately applies the presumption that the same claim terms (here, "first domain" and "second domain") are used consistently throughout the patent (discussed further *infra*). *See PODS*, 484 F.3d at 1366. Accordingly, the claims consistently describe the domains as voltage- and frequency-governed domains of the multi-domain processor, and the power controller as the component managing them. Ex. A, claims 1, 8.

### (c) *The specification further confirms Marvell's proposed construction.*

The '316 Patent's specification confirms Marvell's proposed construction of the term "power controller." In addition to using the claim language as the starting point, claims "must be read in view of the specification," as the specification is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315, 1321 (internal quotation marks and citation omitted).

First, the specification further supports that the "power controller" is hardware. Figure 6 depicts "power control unit 355" as a structural block within processor 300, and the specification explains that it "may include a power sharing logic 359 … to perform dynamic control and re-allocation of an available power budget between multiple independent domains." Ex. A, at 8:19-37. Likewise, Figure 7 depicts "PCU 455" as part of a system agent domain 450 within a multi-domain processor, and the specification states that PCU 455 "can include power sharing logic 459" to "dynamically share an available package power budget between the [first] domain and the [second] domain." *Id.* at 9:3-47. In both embodiments, the PCU is presented as a concrete hardware component within the processor's internal architecture, not an abstract software policy. In conjunction with the Figures depicted below, these disclosures confirm that the '316 Patent

uses "power controller" to refer to a processor-resident hardware component for domain-level power management.



FIG. 6



FIG. 7

Second, the specification further supports construing the "power controller" as configured to control both voltage and frequency of the first domain and the second domain. Figure 1 – a "flow diagram of a high level method of performing power budget allocations between multiple domains" – expressly states in block 130: "Control First And Second Domain's *Frequency And Voltage* Based On Allocated Portion Of Package Power Budget." *Id.* at 5:11-13, Fig. 1 (emphasis added). Further, the '316 Patent's own definition of "domain" confirms that the relevant control target is a domain's voltage and frequency points: "the term 'domain' is used to mean a collection of hardware and/or logic that operates at the same *voltage and frequency point*." *Id.* at 1:54-56 (emphasis added). Elsewhere, the '316 Patent similarly ties "voltage" to "frequency" or "power;" for example, "Each of domains 410 and 420 may operate at different voltage and/or power." *Id.* at 9:17-19. Thus, the specification consistently supports the power controller's ability to control the first domain's and the second domain's voltage and frequency operating points, providing strong support for Marvell's proposed construction.

> ### (d)    *Plaintiff's claim charts support Marvell's proposed construction.*

Plaintiff's claim charts allege that Marvell's accused products satisfy the "power controller" limitation of Claim 8 of the '316 Patent by using hardware that implements a Dynamic Voltage and Frequency Scaling (DVFS) feature. Dkt. No. 25-9 at 2. As its name suggests, DVFS means scaling and *controlling both voltages and frequencies* of the domains of the processor. *Id.* As such, even by Plaintiff's own admission, the term "power controller" should be construed as Marvell proposes, *i.e.*, as configured to control both voltages and frequencies of different domains—a first domain and a second domain—of a multi-domain processor.

> ### (e)    *Extrinsic evidence is consistent with the intrinsic evidence and Marvell's proposed construction.*

Extrinsic evidence from Intel (the original assignee on the face of the '316 Patent) and

others confirms that "power controller" carries the meaning in Marvell's proposed construction. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999) ("[I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field."); *see also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1331 (Fed. Cir. 2012) (affirming reliance on extrinsic evidence that was consistent with intrinsic evidence and supported the district court's conclusion).

First, Intel's own extrinsic evidence confirms that processor power management operates by controlling both voltage and frequency. For example, Intel stated that its "Mobile Pentium III processors featuring Intel SpeedStep technology can dynamically switch ***frequency and voltage*** … ." Ex. E, MARVELL00014677 (emphasis added). Intel then described those power-management states as concrete voltage and frequency operating points: in "Battery Optimized Mode," the processors run at "500 MHz and 1.35 volts," while in "Maximum Performance Mode," they switch to "1.6 volts" and "either 650 or 600 MHz." *Id.* As demonstrated by an IEEE publication, Intel's SpeedStep technology can be and was used to control both voltage and frequency points in multicore processors. *See* Ex. H, MARVELL00014667 ("We use Intel's SpeedStep technology to enforce the desired DVFS level" in a quad-core processor.) This is strong evidence from the original assignee itself, as Intel described its processor power management as controlling both voltage and frequency to reduce or increase processor power consumption—a feature other skilled artisans have implemented in multicore processors. *See* Ex. E, MARVELL00014677; Ex. H, MARVELL00014667.

Second, non-Intel technical literature further confirms that persons of ordinary skill in the

13

art understood processor power control in the same way as Intel, *i.e.*, as capable of controlling both voltages and frequencies. For example, one survey explains that dynamic power is a function of both "supply voltage" and "clock frequency" ($P_{dynamic} = aCV^2f$) and that the "combined reduction of the supply voltage and clock frequency lies in the roots of [DVFS]." Ex. F, MARVELL00014586. Likewise, an IBM paper describes a "PowerPC system-on-a-chip processor which makes use of ***dynamic voltage scaling and on-the-fly frequency scaling*** to adapt to the dynamically changing performance demands and power consumption constraints of high-content, battery powered applications." Ex. G, MARVELL00014647 (emphasis added); *accord* Ex. H, MARVELL00014660, 14667 (discussing DVFS and the implementation of Intel SpeedStep to enforce DVFS). Therefore, the extrinsic evidence is consistent, confirming that both Intel, as original assignee, and skilled artisans in the field described processor power management as involving control of both voltage and frequency.

### 2.    "a first domain and a second domain" ('316 Patent, claims 8-12)

| Claim Term | Marvell's Proposed Construction | Daedalus's Proposed Construction |
| --- | --- | --- |
| "a first domain and a second domain" | "A first collection of hardware and/or logic and a second collection of hardware and/or logic, wherein each domain is configured to operate at different voltage and frequency points." | Plain and ordinary meaning, with the definition of "domain" being "a first collection of hardware and/or logic that operates at the same voltage and frequency point." |

The term "a first domain and a second domain" should be construed as "a first collection of hardware and/or logic and a second collection of hardware and/or logic, wherein each domain is configured to operate at different voltage and frequency points."

Plaintiff's anticipated reliance on "plain and ordinary meaning" risks improperly broadening the term. The critical issue is how to divide a multidomain processor into multiple

domains, and whether "a first domain and a second domain" are differentiated by operating at different/independent voltage and frequency points. This is contemplated, and expressly claimed, in the '316 Patent.

>    **(a)    *The claim language shows that the "first domain" and the "second domain" operate at different voltage and frequency points.***

The '316 Patent's claim language strongly supports construing "a first domain and a second domain" in claim 8 to refer to domains configured to operate at independently-controlled voltage and frequency points because that is how claim 1 defines it. *See* Ex. A, claim 1. The Federal Circuit has made clear that "the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims." *PODS*, 484 F.3d at 1366 (citation omitted); *see also Katrinecz v. Motorola Mobility LLC*, No. 1:12-CV-235-LY, 2014 WL 60328, at *5 (W.D. Tex. Jan. 6, 2014) (relying on agreed construction of "keys of an optically transmissive material" to construe "optically transmissive keyboard top plate" due to the presumption).

That rule applies here. Claim 1, an apparatus claim, expressly recites "a first domain and a second domain, each of the first and second domains to operate at an ***independent voltage and frequency***." Ex. A, claim 1 (emphasis added). Claim 8, a method claim, then uses those same terms in reciting a "multi-domain processor including a first domain and a second domain," wherein a power controller determines and allocates a power budget across the domains within the multi-domain processor. *Id.* at claim 8; *see also supra* Section IV.A.1(b). Under *PODS*, the Court should presume that "a first domain and a second domain" carry the same meaning across these claims, particularly where apparatus claim 1 provides claim-level context confirming how the '316 Patent uses the "first domain" and "second domain" terms in the same multi-domain

processor being described in method claim 8. *See* 484 F.3d at 1366; *see also* Ex. A, claims 1, 8.

Moreover, *PODS* and *Katrinecz* are analogous. In *PODS*, the Federal Circuit construed terms in method claim 29 consistently with the more detailed language in apparatus claim 1, rejecting the notion that the absence of the fuller description in claim 29 required a different construction. *Id.* at 1364, 1366-67. And in *Katrinecz*, the court construed "optically transmissive keyboard top plate" by relying on the agreed-upon construction of "keys of an optically transmissive material," because nothing suggested that "optically transmissive" should carry a different meaning across the claims. *See* 2014 WL 60328 at *5. The same reasoning applies here. Like in *Katrinecz*, the parties have agreed that "domain" means "a collection of hardware and/or logic that operates at the same voltage and frequency point." *See id.*; *see also* Ex. A, at 1:54-56. And like in *PODS*, claim 1 provides the patent's most explicit claim-level description of the "first domain" and the "second domain" by stating that each operates at an independent voltage and frequency. *See* 484 F.3d at 1364, 1366-67; Ex. A, claim 1. Claim 8 employs those same terms, in the same technological context, without any textual significance that their meaning changes. *See id.* at claim 8. Nor is there anything in the specification or prosecution history suggesting that "a first domain and a second domain" should be construed differently in claim 8. To the contrary, as discussed below, the specification confirms this construction.

### (b)    *The specification confirms Marvell's proposed construction.*

The specification confirms Marvell's proposed construction and reinforces that "a first domain and a second domain" should be read consistently with claim 1. First, the '316 Patent expressly defines "domain" in voltage and frequency terms: "the term 'domain' is used to mean a collection of hardware and/or logic that operates at the ***same voltage and frequency point***." *Id.* at 1:54-56 (emphasis added). Moreover, the parties have agreed to this construction of "domain." Marvell's proposed construction tracks that express definition. It preserves the patent's

16

requirement that each "domain" be a collection of hardware and/or logic identified by a common voltage and frequency point, while simultaneously giving effect to claim 1's requirement that the "first domain" and the "second domain" operate at independent voltage and frequency points. *See id.* at claim 1. In other words, the express definition of "domain" in the specification supplies the core of the construction, and claim 1 confirms how the two claimed domains relate to each other. The agreed construction of "domain" is relevant to construing "a first domain and a second domain," as was the case in *Katrinecz*. *See* 2014 WL 60328 at *5.

Second, the specification repeatedly describes the invention as involving multiple independent domains whose operations are governed by voltage- and frequency-based power allocation. The '316 Patent explains that a processor can include at least multiple independent domains, including, for example, a core domain and a graphics domain that "collectively share a single power budget." *See, e.g.*, *id.* at 2:1-2, 5:67-6:20. That disclosure mirrors claim 1's treatment of the "first domain" and the "second domain" as having distinct voltage and frequency points, and confirms that "domain" is not merely a functional label, but a power-management feature defined by its operating points. The same understanding appears in Figure 1, which is "a high level method of performing power budget allocations between multiple domains," wherein block 130 states: "Control First And Second Domain's *Frequency And Voltage* Based On Allocated Portion of Package Power Budget." *Id.* at 5:11-13, Fig. 1 (emphasis added). Thus, the specification affirmatively supports Marvell's proposed construction by defining "domain" in terms of voltage and frequency (as agreed by the parties), describing the multi-domain power budgeting system, and expressly tying domain power control to both voltage and frequency. That is precisely the kind of construction that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Phillips*, 415

17

F.3d at 1316 (citation omitted).

> **(c)** ***The extrinsic evidence is consistent with the intrinsic evidence and supports Marvell's construction.***

Like "power controller," the extrinsic evidence confirms Marvell's proposed construction of "a first domain and a second domain." *See Pitney Bowes*, 182 F.3d at 1309 (Fed. Cir. 1999); *see also Aventis*, 675 F.3d at 1331.

First, as discussed, Intel's own extrinsic evidence confirms that processor power budget management operates through coordinated control of voltage and frequency operating points. *See supra* Section IV.A.1(e). For the reasons discussed above, this is strong evidence from the original assignee itself, in which Intel did not describe processor power management in terms of frequency alone, but rather in terms of distinct voltage and frequency points. *See id.* This directly supports Marvell's proposed construction.

Second, the same technical literature supporting Marvell's proposed construction of "power controller" is also relevant to "a first domain and a second domain" because that literature concerns processor power management, and the '316 Patent discusses power management in the context of processor domains. *See id.*

Moreover, the IBM paper cited above also explains that "power distribution has been divided into four distinct ***domains***" for dynamic voltage scaling ("DVS"), which allows dynamically varying voltages across domains. *See* Ex. G, MARVELL0014648 (right col.) (emphasis added). It further explains that the system "makes use of dynamic voltage scaling and on-the-fly frequency scaling," and that "***both the voltage and the frequency*** of the processor can be modified." *Id.* at MARVELL00014647 (abstract), 14652 (right col.) (emphasis added). This is particularly probative here as it speaks to both processor power management in general and to domains, each associated with shared voltage and frequency operation in particular. Therefore,

18

the extrinsic evidence from both Intel and skilled artisans in the field is "consistent with the intrinsic evidence and supports the conclusion that" power management across domains is achieved through voltage and frequency scaling, such that different domains operate at different voltage and frequency points. *Aventis*, 675 F.3d at 1331.

### 3. "workload configuration input regarding a workload" ('197 Patent, claims 1-2) / "workload configuration value" ('197 Patent, claim 15)[4]

| Claim Terms | Marvell's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "workload configuration input regarding a workload"<br><br>"workload configuration value" | "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g., nonuniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive)" | Plain and ordinary meaning. |

The terms "workload configuration input regarding a workload" (claims 1-2) and "workload configuration value" (claim 15) require construction. Plaintiff's reliance on "plain and ordinary meaning" does not eliminate the parties' real dispute about what these terms cover. The Court should resolve that dispute.

The claim language itself sheds light on the meaning of "workload configuration input." Claim 15 expressly states that the "workload configuration value" is used "to indicate a predominant workload type to be executed on the system," and thus provides direct guidance as to what the claimed input represents in support of Marvell's proposed construction. This is also consistent with the settled principle that claim terms are generally used consistently throughout a

---

[4] Consistent with both parties' contentions that the two terms carry the same meaning, Marvell argues them together herein.

patent, such that "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314.

The specification reinforces that reading in the only paragraph that directly discusses the claimed term:

> In some embodiments, in addition to the EPB input, a workload configuration input can be provided. To this end, the table can have 3 dimensions such that based on the workload configuration input, a different set of entries for the defined power management features can be accessed, as different values may be present in the table for different workload configurations. By this workload configuration input a vertical user having an understanding and control of the exact workloads running on their systems can benefit from well-tuned settings. As examples, a user can configure a workload input as nonuniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive, etc. This input allows for choosing tuning settings that favor a specific workload pattern. For example, if the workload is NUMA, aggressive settings can be applied to off-chip interconnects such as Intel® Quick Path Interconnect (QPI) links to save as much power possible while causing very little performance impact, as off-chip accesses can be expected to be low. Thus for embodiments in which a workload configuration input is provided, it can be used as an additional input to access the table.

Ex. B, at 6:61-7:14. That passage explains that a "workload configuration input" is intended for users who have "an understanding and control of the exact workloads running on their machines" and therefore can "benefit from well-tuned settings. *Id.* It further states that the input permits users to "choos[e] tuning settings that favor a specific workload pattern." *Id.* In other words, beyond providing the EPB value, the user may also provide a workload configuration value that identifies the kind of workload expected to run, allowing the system to select power management settings tailored to that workload.

The specification's examples provide further support for Marvell's proposed construction. It explains that "a user can configure a workload input as non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive, etc." *Id.* Those examples show that the claimed "workload configuration input regarding a workload"

is directed to the predominant type or pattern of workload expected to be run on a system. The specification gives a concrete example: "if the workload is NUMA, aggressive settings can be applied to off-chip interconnects … to save as much power [as] possible while causing very little performance impact, as off-chip accesses can be expected to be low." *Id.* The specification thus makes clear that a "workload configuration input regarding a workload" is not merely a generic power management preference. Rather, it identifies a particular workload type so that the system can apply more precisely tuned settings for that workload. *See Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1010 (Fed. Cir. 2023) ("[A] skilled artisan would understand that the specification's descriptions of [the term] and the corresponding embodiments adequately guide the skilled artisan to the meaning of [the term].").

The remainder of the specification is consistent with this reading. In the Background, the '197 Patent identifies as a prior-art problem that "there is little knowledge of the actual workload and usage pattern for the system in the field." Ex. B, at 1:55-57. The '197 Patent then describes addressing that problem by allowing a sophisticated user to "tune" the chip's power management behavior based on different workloads in order to achieve desired power/performance settings. *Id.* at 8:40-52. To do so, the specification explains that "each individual power management feature is tuned separately while the other features are turned off," and that a power/performance profile is generated "across a range of workloads" for each feature. *Id.* at 8:40-45. It gives an example of executing various benchmark workloads to generate that profile. *Id.* at 8:45-47. This discussion reflects an understanding of "workload" as the kind of pattern of processing activity being run—*i.e.*, work with particular execution and hardware demands—rather than as a generic preference for saving power or improving performance. The same is true of the '197 Patent's description of iterative tuning, in which "different EPB values are input and workloads run with

each setting." *Id.* at 8:54-58. Taken together, these passages confirm that "workload" in the '197 Patent refers to the type of work the system is expected to execute, not merely a generalized power/performance preference.

Given the claim language and the specification's examples, which describe the "workload configuration value / input" as a value that describes a predominant pattern of execution with particular hardware configuration demands such as NUMA, UMA, I/O intensive, etc., the Court should adopt Marvell's proposed construction.

### 4. "multi-threaded core" ('960 Patent, claims 1, 15, 20; '919 Patent, claims 1, 16, 21)

| Claim Term | Marvell's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "multi-threaded core" | "A type of core that has hardware support for executing two or more threads at the same time/in parallel." | Plain and ordinary meaning. |

In light of the parties' infringement disputes, the term "multi-threaded core" should be construed to clarify the distinction between "single-threaded" cores and "multi-threaded" cores and hardware versus software support of multithreading. Plaintiff claims that the term should be given its "plain and ordinary meaning," but this does not resolve the parties' dispute over the claims' scope. Namely, whether a "multi-threaded core" has hardware support for executing two or more threads at the same time/in parallel or whether it is sufficient to simply execute or "manage" multiple threads, even sequentially as scheduled by software as Plaintiff suggests in at least its initial claim charts and Opposition to Marvell's Motion to Dismiss Amended Complaint (*see* Dkt. No. 29 at 10-11). The Court should resolve this dispute.

#### (a) *The specifications confirm Marvell's proposed construction.*

The '960 and '919 Patents' specifications draw a clear distinction between single-

threaded and multi-threaded cores, defining the latter as having hardware support to execute two or more threads at the same time/in parallel. Namely, the patents expressly distinguish between two different types of cores, stating that the "cores may be *either* single threaded or multi-threaded." Exs. C, D, at 3:20-21 (emphasis added). The distinction is significant as it treats "multi-threaded" as a characteristic of the core's hardware itself, not merely a software scheduling practice. The specifications reinforce that hardware-focused usage by explaining that a "hardware thread" is "logic located on an integrated circuit that is capable of maintaining an independent architectural state, in which the independently maintained architectural state shares access to the execution resources it uses." Exs. C, D, at 3:29-32. Thus, when the '960 and '919 Patents refer to a "multi-threaded core," they are referring to a core with on-die hardware support for executing multiple hardware threads. *See* Exs. C, D, at 3:20-32.

The specifications then define "multithreading" by stating, "It should be understood that the core may support multithreading (executing two or more *parallel* sets of operations or threads) … ." Exs. C, D, at 16:33-35 (emphasis added). The '960 and '919 Patents further provide the example of "simultaneous multithreading (where a single physical core provides a logical core for each of the threads that physical core is *simultaneously multithreading*)." Exs. C, D, at 16:36-39 (emphasis added). Read together, these passages illustrate that the '960 and '919 Patents use "multi-threaded core" to mean "a type of core that has hardware support for executing two or more threads at the same time/in parallel." That understanding is confirmed elsewhere in the intrinsic record, where the specification states that, in Figure 10, "one or more of the cores 1002A-N are capable of multi-threading." Exs. C, D, at 18:28-29. Moreover, the claims themselves recite "symmetric multi-threaded cores," confirming that "multi-threaded" denotes a structural class of core as contained in Marvell's proposed construction. Ex. C, claims

1, 15, 20; Ex. D, claims 1, 16, 21. Accordingly, Marvell's proposed construction "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Phillips*, 415 F.3d at 1316 (citation omitted).

> **(b)**    ***Extrinsic evidence is consistent with the intrinsic evidence and supports Marvell's proposed construction.***

Extrinsic evidence from Intel (the original assignee on the face of the '960 and '919 Patents) and others confirms that "multi-threaded cores" carry the meaning in Marvell's proposed construction. *See Pitney Bowes*, 182 F.3d at 1309 (Fed. Cir. 1999); *see also Aventis*, 675 F.3d at 1331. When specific terms are used in a patent, extrinsic evidence can establish the particular meaning given to those terms by a person of ordinary skill in the art. *See Phillips*, 415 F.3d at 1318; *see also NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1365-66 (Fed. Cir. 2024) (affirming district court's reliance on technical dictionaries to define "VoIP" as used in the patent); *cf. Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1365 (Fed. Cir. 2022) (in reversing district court's indefiniteness analysis, finding that the claim's meaning is properly viewed in light of prior art on "Delaunay method" and "Watson algorithm" discussed in patent).

First, Intel itself uses "multi-threaded core" in a manner consistent with Marvell's proposed construction. For example, Intel explains that its "Hyper-Threading Technology is a hardware innovation that allows ***more than one thread to run on each core***," such that "more work can be done ***in parallel***."[5] Ex. I, MARVELL00014698 (https://www.intel.com/content/www/us/en/gaming/resources/hyper-threading.html) (emphasis added).  Intel goes on to state that, when Hyper-Threading is active, "the CPU exposes two execution contexts per

---

[5] Hyper-threading is Intel's term for multi-threading. *See, e.g.*, Exs. C, D, at 16:39-41; Ex. I, MARVELL00014698.

physical core," which it contrasts with "a traditional single-threaded core." *Id.* This is especially telling here, as the '960 and '919 Patents provide "Hyperthreading" as an example of multithreading: "time sliced fetching and decoding and ***simultaneous multithreading*** thereafter such as in the ***Intel® Hyperthreading*** technology." Exs. C, D, at 16:39-41 (emphasis added). Accordingly, this Intel extrinsic evidence is relevant to the meaning of "multi-threaded" in light of the patents' discussion of "Hyperthreading technology." *See NexStep*, 119 F.4th at 1365-66; *Phillips*, 415 F.3d at 1318; *cf. Autodesk*, 50 F.4th at 1365.

Second, technical literature further uses "multi-threaded core" in the same way. For example, one paper explains that a thread-level parallelism exists where "multiple threads can be executed in parallel on multicore processors or concurrently on hardware multithreaded processors." Ex. J, MARVELL00014654. The paper further explains that a "hardware multithreaded processor … provides the hardware resources and mechanisms to execute several hardware threads on one processor core … ." *Id.*  Therefore, extrinsic evidence from both Intel and skilled artisans in the field is "consistent with the intrinsic evidence and supports the conclusion that" "multi-threaded cores" means cores with hardware support to execute multiple threads at the same time/in parallel. *Aventis*, 675 F.3d at 1331.

5.      **"first cluster" / "second cluster" ('960 Patent, claims 1, 2, 5-10, 15-16, 18-20; '919 Patent, claims 1, 4, 6-12, 16, 18-22)**

| Claim Term | Marvell's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "first cluster" | "A first group of a plurality of cores operating at a first voltage and a first frequency." | Plain and ordinary meaning. |

| Claim Term | Marvell's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "second cluster" | "A second group of the | Plain and ordinary meaning. |

25

| | plurality of cores operating at a second voltage and a second frequency that are different from the first voltage and the first frequency, respectively." | |
|---|---|---|

The Court should construe "first cluster" in the '960 and '919 Patents as "a first group of a plurality of cores operating at a first voltage and a first frequency." Relatedly, "second cluster" should be construed as "a second group of the plurality of cores operating at a second voltage and a second frequency that are different from the first voltage and the first frequency, respectively."

Plaintiff's anticipated reliance on "plain and ordinary meaning" risks improperly broadening the terms in a manner inconsistent with the patents and Plaintiff's own infringement contentions. For example, Plaintiff's opposition to Defendant's motion to dismiss suggests that Plaintiff intends to improperly broaden the terms "first cluster" and "second cluster" to divide the clusters in the accused products in a seemingly arbitrary way based on only distances. *See* Dkt. No. 29 at 13.

First, the claim language confirms that each "cluster" must contain multiple cores, not merely a single core. Claims 1, 15, and 20 of the '960 Patent recite a "first cluster of the plurality of cores which are ***physically proximate to one another*** … , wherein an average distance between ***cores in the first cluster*** is less than an average distance between the plurality of cores … ." Ex. C, claims 1, 15, 20 (emphasis added); *see also* Ex. D, claims 1, 16, 21. A single core has no "distance between cores" within the cluster, much less an "average distance between cores in the first cluster" that can be compared to the average distance across the larger plurality of cores. Ex. C, claims 1, 15, 20; *see also* Ex. D, claims 1, 16, 21. As such, the claims themselves require that each cluster be a group of cores drawn from the plurality of cores.

Second, the intrinsic record supports construing the "first cluster" and the "second cluster" as operating at different cluster-level voltage and frequency points. Figure 6 depicts two clusters operating in different power states—one in a "higher power consumption state" and another in a "lower power consumption state." Exs. C, D, Fig. 6. And the specification explains that a cluster's power state may be reduced by "reducing the *frequency* of the virtual cluster" and "reducing the *voltage* of the virtual cluster," among others. Exs. C, D, at 12:17-22 (emphasis added). Read together, these passages show that the patents treat clusters as groupings of cores that operate at cluster-level power consumption points, including both voltage and frequency. And because Figure 6 expressly describes one cluster being in a "higher power consumption state" and the other being in a "lower power consumption state," the '960 and '919 Patents teach that the first and the second clusters operate at different voltage and frequency points rather than the same ones.

Third, Plaintiff's own claim charts confirm that this is the correct understanding of the claim terms. Plaintiff alleges that "Octeon 10 uses the Neoverse N2 architecture to implement hierarchical clock gating and per-core *Dynamic Voltage and Frequency Scaling* (DVFS), allowing different domains of the processor—such as individual cores or clusters—to have their own power states and budgets … ." Dkt. No. 25-7 at 9 (emphasis added); Dkt. No. 25-8 at 9 (emphasis added). This is telling. DVFS, by its name, is a voltage- and frequency-scaling mechanism for power consumption. By relying on DVFS and different cluster power states to satisfy the "first cluster" and "second cluster" limitations, Plaintiff itself treats the claimed "clusters" as groups of cores that operate at distinct cluster-level voltage and frequency points. Plaintiff cannot rely on different voltage and frequency operating states to show infringement, while simultaneously resisting constructions that reflect exactly that understanding. Therefore,

Marvell's proposed construction "stays true to the claim language and most naturally aligns with the patent's description of the invention," which is further confirmed by Plaintiff's claim charts. *Phillips*, 415 F.3d at 1316 (citation omitted).

### B.    Indefiniteness

A patent claim is invalid for indefiniteness under pre-AIA 35 U.S.C. § 112, ¶ 2[6] if the claim language, "read in light of the patent's specification and prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The purpose of this requirement is "to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005), *abrogated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014). "Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

### 1.    "is to" ('197 Patent, claims 2-3, 5-7, 9-10, 14-16, 18-20)

| Claim Term | Marvell's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "is to" | Indefinite. | Plain and ordinary meaning. |

Several asserted claims in the '197 Patent are indefinite because they are drafted as apparatus claims yet recite the system's operation in use. Claim 15, for example, does not merely describe the tuning circuit's structural capability in the abstract; it states that "the tuning circuit is

---

[6] Although the America Invents Act's revisions to Section 112, ¶ 2 are not material, the pre-AIA version of the statute applies here because all of the asserted patents claim priority to applications filed before March 16, 2013, the effective date of the AIA.

to access an entry of a tuning table based at least in part on the EPB value and a workload configuration value and update a setting for a power management feature responsive to a value stored in a field of entry." Ex. B, claim 15. That formulation mixes a claimed machine with the performance of operation steps, creating the same problem identified in *IPXL*: the claim leaves uncertain whether infringement occurs upon making or selling the apparatus, or only when the apparatus is actually used to perform the recited actions. *See IPXL Holdings, L.L.C. v. Amazon.com*, Inc., 430 F.3d 1377, 1384 (Fed. Cir. 2005). The Federal Circuit has repeatedly held that this type of mixed or hybrid claiming is indefinite because it is "unclear when infringement occurs" and "does not apprise a person of ordinary skill in the art of its scope." *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335 (Fed. Cir. 2014) (citation omitted); *IPXL*, 430 F.3d at 1384; *see also In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) (holding that apparatus claims are indefinite when they require both specific structure and the performance of method steps, rather than merely reciting the structure's functional capability). Such "indefiniteness depends only on whether the claim, on its face, recites both an apparatus and method steps of using the apparatus." *Lecat's Ventriloscope v. MT Tool & Mfg.*, 351 F.Supp.3d 1100, 1113 (N.D. Ill. 2018).

Similarly, in *Courtesy Products, L.L.C. v. Hamilton Beach Brands, Inc.*, No. 13-2012-SLR, 2015 WL 7295436 (D. Del. Nov. 18, 2015), the court held beverage-brewing apparatus claims indefinite where they recited not just machine components, but the machine in operation—*e.g.*, "the brew baskets being inserted into the location in the beverage brewing machine," and "the brewing machine hearing water from the water reservoir." *Id.* at *4-5. The court reasoned that this mixed claiming left a POSITA unable to tell whether infringement turned on "an apparatus capable of heating water and having brew baskets inserted or when a person

actually uses the beverage brewing system to heat water and inserts a brew basket." *Id.* at *5.

The same principle applies to the '197 Patent claims that recite a "system," "processor," or "non-transitory machine-readable medium" and then require that the component "is to" perform specified actions. For example, claim 2 requires that the processor's "power controller is to access a power-performing tuning table … ." Ex. B, claim 2. This phrasing does not use the sort of capability language the Federal Circuit has treated as permissible in apparatus claims, such as "configured to" or "adapted to," which ordinarily describe what the claimed structure is designed to do. *See UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826-27 (Fed. Cir. 2016); *see also Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012). Rather, by stating that the claimed component "is to" perform recited actions, the claims read as requiring the performance of those acts, not merely possessing the capability to do so. The result is the same uncertainty condemned in *IPXL* and its progeny: the face of the claim does not make clear whether infringement occurs upon making or selling the claimed apparatus, or only when the apparatus is actually used to perform the recited steps. *See, e.g.*, *IPXL*, 430 F.3d at 1384. Accordingly, the '197 Patent's claims using the phrase "is to" are indefinite because they improperly blur the boundary between an apparatus and method claim.

## V.    CONCLUSION

For the foregoing reasons, Marvell respectfully requests that the Court (1) adopt Marvell's specific proposed constructions, and (2) find that the "is to" claims of the '197 Patent are indefinite and therefore invalid.

DATED: May 11, 2026               Respectfully submitted,


/s/ *Karineh Khachatourian (by JPA with permission)*

Karineh Khachatourian
David Xue
Trevor Giampaoli
Haley Sinfield
**KXT LAW, LLP**
1775 Woodside Road, Suite 204
Redwood City, California 94061
Telephone:  650-239-0420
Fax:  650-249-5013

Jennifer P. Ainsworth
TX State Bar No. 00784720
jainsworth@wilsonlawfirm.com
**WILSON, ROBERTSON & VANDEVENTER, P.C.**
909 ESE Loop 323, Suite 400
Tyler, Texas 75701
Telephone: 903-509-5000
Fax: 903-509-5091

Attorneys for Defendant,
Marvell Technology, Inc.

31

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the parties, or the attorney(s) of record for all parties to the above cause in accordance with the Federal Rules of Civil Procedure on this 11th day of May 2026.

*Jennifer P. Ainsworth*
Jennifer P. Ainsworth