**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| DAEDALUS PRIME LLC,<br><br>    *Plaintiff*,<br><br>v.<br><br>MARVELL TECHNOLOGY, INC.,<br><br>    *Defendant*. | Civil Action No. 1:26-cv-00081-ADA<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF DAEDALUS PRIME LLC'S
<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARD ........................................................................................ 1

III.  ARGUMENT...................................................................................................... 4

   A.   U.S. Patent No. 8,769,316, Claim 8, "power controller"................................... 4

      1.   Marvell's "hardware" constraint contradicts the entire record. ..................... 4

      2.   Claim 8 omits voltage. Marvell cannot put it back.......................................... 7

      3.   Marvell's additional language is redundant of Claim 8. ............................... 10

   B.   U.S. Patent No. 8,769,316, Claims 8–12, "a first domain and a second domain"............ 10

      1.   Claim 8's text omits the cross-domain limitation Marvell seeks to import. ................. 11

      2.   The specification does not require Marvell's qualifier. ............................... 13

      3.   The extrinsic evidence also repudiates Marvell's construction. ................... 13

   C.   U.S. Patent No. 10,372,197, Claims 1–2, "workload configuration input," Claim 15, "workload configuration value".................................................................. 14

   D.   U.S. Patent No. 10,705,960, Claims 1, 15, 20; U.S. Patent No. 10,725,919, Claims 1, 16, 21, "multi-threaded core" ........................................................... 18

      1.   The claim language uses "multi-threaded cores" without any modifiers. .................... 19

      2.   The specification includes time-sliced and combination multithreading. .................... 19

      3.   Extrinsic evidence confirms that multithreading is broader than SMT. ....................... 20

   E.   U.S. Patent No. 10,705,960, Claims 1, 2, 5–10, 15, 16, 18–20; U.S. Patent No. 10,725,919, Claims 1, 4, 6–12, 16, 18–22, "first cluster" / "second cluster" ........................... 24

   F.   U.S. Patent No. 10,372,197, Claims 2–3, 5–7, 9–10, 14–16, 18–20, "is to"................... 27

IV.   CONCLUSION.................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013) ................................................................................3, 17

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ......................................................................................7

*Ancora Techs., Inc. v. Apple, Inc.*,
    744 F.3d 732 (Fed. Cir. 2014) ...............................................................................8, 11, 12

*Biosonix, LLC v. Hydrowave, LLC*,
    230 F. Supp. 3d 598 (E.D. Tex. 2017)..........................................................................8, 12

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
    895 F.3d 1374 (Fed. Cir. 2018) ....................................................................................16

*Broadcom Corp. v. ITC*,
    28 F.4th 240 (Fed. Cir. 2022) .......................................................................................5

*Caterpillar Tractor Co. v. Berco, S.p.A.*,
    714 F.2d 1110 (Fed. Cir. 1983) .....................................................................................7

*The Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
    676 F. App'x 980 (Fed. Cir. 2017) ................................................................................5

*Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*,
    No. 13-2012-SLR, 2015 WL 7295436 (D. Del. Nov. 18, 2015).........................................29

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
    438 F.3d 1374 (Fed. Cir. 2006) ................................................................................7, 11

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*,
    156 F.4th 1259 (Fed. Cir. 2025).....................................................................................2

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014) ...........................................................................1, 2, 4, 25

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
    57 F.4th 1001 (Fed. Cir. 2023).....................................................................................17

*H-W Tech., L.C. v. Overstock.com, Inc.*,
    758 F.3d 1329 (Fed. Cir. 2014) ...................................................................................29

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ..................................................................................6, 13

*Intell. Ventures I LLC v. Altera Corp.*,
    No. 10-1065-LPS, 2013 WL 3913646 (D. Del. July 26, 2013) ..........................................5

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005) ...............................................................27, 28, 29

*Katrinecz v. Motorola Mobility LLC*,
    No. 1:12-CV-235-LY, 2014 WL 60328 (W.D. Tex. Jan. 6, 2014).....................................12

*In re Katz Interactive Call Processing Pat. Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) ...............................................................................29

*Lecat's Ventriloscope v. MT Tool & Mfg.*,
    351 F. Supp. 3d 1100 (N.D. Ill. 2018)........................................................................29

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc) .......................................................................2

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)................................................................................................1

*MasterMine Software, Inc. v. Microsoft Corp.*,
    874 F.3d 1307 (Fed. Cir. 2017) ...............................................................28, 29, 30

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) .................................................................................8

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
    520 F.3d 1367 (Fed. Cir. 2008) ...............................................................................28

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)................................................................................................3

*Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*,
    No. 6:11-CV-492-RWS-KNM, 2017 WL 5180347 (E.D. Tex. Oct. 18, 2017)..............8, 12

*ParkerVision, Inc. v. Qualcomm Inc.*,
    903 F.3d 1354 (Fed. Cir. 2018) ...............................................................28, 30

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................. *passim*

*PODS, Inc. v. Porta Stor, Inc.*,
    484 F.3d 1359 (Fed. Cir. 2007) ...........................................................................8, 12

*Polaris PowerLED Techs., LLC v. Dell Techs., Inc.*,
    No. 1:22-CV-973-RP, 2025 WL 2525457 (W.D. Tex. Mar. 10, 2025)................................2

*Proxense, LLC v. Microsoft Corp.*,
No. W-23-CV-00319-ADA, 2024 WL 2703020 (W.D. Tex. May 24, 2024)................2, 17

*In re Reiffin Fam. Trust*,
340 F. App'x 651 (Fed. Cir. 2009) ......................................................................................19

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001) ..................................................................................16, 17

*Seachange Int'l, Inc. v. C-COR, Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) ......................................................................................7, 8

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) ....................................................................................3, 27

*Tandon Corp. v. ITC*,
831 F.2d 1017 (Fed. Cir. 1987) ..................................................................................11, 16

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) .................................................................................. *passim*

*ThroughPuter, Inc. v. Amazon Web Servs., Inc.*,
No. 1:22-CV-1095-DAE, 2025 WL 2946606 (W.D. Tex. Sept. 9, 2025) .............................2

*UltimatePointer, L.L.C. v. Nintendo Co.*,
816 F.3d 816 (Fed. Cir. 2016) ....................................................................................28, 29

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .........................................................................6, 14, 20, 23

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006) ..................................................................................10, 27

**Statute**

35 U.S.C. § 112 ...........................................................................................................3, 27

## I.     INTRODUCTION

Marvell's Opening Claim Construction Brief ("Def.'s Br.," Dkt. 44) asks this Court to do two things the Federal Circuit has long forbidden: rewrite disputed claim terms to track narrower preferred embodiments instead of the broader language the patentees actually wrote, and invalidate claims of the '197 Patent based on a claim-drafting convention indistinguishable from formulations the Federal Circuit has repeatedly upheld.

Marvell's claim construction disputes are all variations of one move. In each, Marvell takes broad claim language, locates a preferred embodiment or selects a passage reciting a narrower implementation, and asks the Court to rewrite the claim. The Federal Circuit has "repeatedly warned against confining the claims" to "very specific embodiments of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) (collecting cases). And Marvell does not come close to meeting the "exacting" standards for redefining a claim term from its plain and ordinary meaning. *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

Marvell's indefiniteness challenge to "is to" fares no better. The Federal Circuit has long upheld "configured to," "adapted to," and even bare active verbs ("presents," "receives," "generates") as describing structural capability. "Is to" performs the same claim-drafting work as these other drafting forms: it ties a recited function to a recited structure, thus identifying that structure's capability. Marvell offers no reason why it should be treated any differently.

Accordingly, the Court should reject Marvell's proposed constructions and indefiniteness challenge and adopt Daedalus's constructions.

## II.     LEGAL STANDARD

Claim construction is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The words of a claim "are generally given their ordinary and customary meaning" as understood by "a person of ordinary skill in the

- 1 -

art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (internal quotations and citations omitted). In construing patent claims, courts should start with the language of the claims themselves, giving terms "their ordinary and customary meaning," which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Id*. Claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). Courts may "also consider the patent's prosecution history" in construing claim terms. *Phillips*, 415 F.3d at 1317 (citations omitted). The claim language, specification, and prosecution history constitute the intrinsic evidence.

The Federal Circuit applies a "heavy presumption that claim terms carry their full ordinary and customary meaning." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 156 F.4th 1259, 1273 (Fed. Cir. 2025) (internal quotation and citation omitted); *accord Proxense, LLC v. Microsoft Corp.*, No. W-23-CV-00319-ADA, 2024 WL 2703020, at *1 (W.D. Tex. May 24, 2024). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see also, e.g.*, *ThroughPuter, Inc. v. Amazon Web Servs., Inc.*, No. 1:22-CV-1095-DAE, 2025 WL 2946606, at *2–3 (W.D. Tex. Sept. 9, 2025) (citing *Thorner*); *Polaris PowerLED Techs., LLC v. Dell Techs., Inc.*, No. 1:22-CV-973-RP, 2025 WL 2525457, at *2 (W.D. Tex. Mar. 10, 2025) (citing *Thorner*); *Proxense*, 2024 WL 2703020, at *1 (citing *Thorner*). "The standards for finding lexicography and disavowal are exacting." *GE Lighting*, 750 F.3d at 1309. To act as a lexicographer, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments"; instead, a patentee "must clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotation and citation omitted). A

- 2 -

patentee "may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.* at 1366 (citation omitted). "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Id.* (citations omitted). "It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation." *Id.* "We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that." *Id.* When "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Courts may also consider "extrinsic evidence," including expert testimony, dictionaries, and learned treatises, to better understand the technical field and understand what a person of skill in the art would understand claim terms to mean. *See Phillips*, 415 F.3d at 1317. Extrinsic evidence is of less significance than the intrinsic record, *see id.* at 1317–24, and it may not be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324.

Pre-AIA 35 U.S.C. § 112 ¶ 2 (2010) requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." This provision requires that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). The party asserting invalidity must prove indefiniteness by clear and convincing evidence. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### III.    ARGUMENT

####    A.    U.S. Patent No. 8,769,316, Claim 8, "power controller"

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Marvell |
|---|---|---|---|
| "power controller" | '316 Patent, claim 8 | Plain and ordinary meaning | "A hardware controller configured to control voltages and frequencies of a first domain and a second domain of a multi-domain processor." |

U.S. Patent No. 8,769,316 (the "'316 Patent" or "'316 Pat.," Dkt. 25-4; *see also* Dkt. 44-2), is titled "Dynamically Allocating a Power Budget Over Multiple Domains of a Processor." Claim 8 recites a "power controller of a multi-domain processor" that performs three named functions: determining a power budget, allocating portions of the budget to domains, and controlling a frequency of those domains. '316 Pat., cl. 8. The plain and ordinary meaning of "power controller" is exactly that—a structural component of a processor that performs the recited functions. The Court should hold that "power controller" carries its plain and ordinary meaning.

Marvell's construction layers three importations onto that term: (i) restricting the controller to "hardware," (ii) adding "voltages" to a function Claim 8 deliberately limits to "frequency," and (iii) repeating "of a first domain and a second domain of a multi-domain processor"—words that Claim 8 already supplies. None survives the Federal Circuit's "exacting" standards for lexicography and disavowal. *GE Lighting*, 750 F.3d at 1309 (citing *Thorner*, 669 F.3d at 1365). All are contradicted by Marvell's own extrinsic record.

####            1.    Marvell's "hardware" constraint contradicts the entire record.

Marvell's textual argument is that "frequency and power control are hardware-level specific processor operations," and therefore "claim 8 uses the language of a hardware controller." Def.'s Br. at 8. The argument fails on its own terms. Claim 8 recites a "power controller," not a "hardware controller." Marvell cannot supply the modifier the patentee omitted. *Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims; we do not redefine words.

Only the patentee can do that."). The point is not that the claimed power controller is divorced from the processor architecture; Claim 8 expressly locates it "of a multi-domain processor." The point is that Marvell's "hardware" label excludes firmware, software-directed configuration, and control logic interfaces that the intrinsic record places in the processor power-control loop. Software writing to a control register controls the frequency of a hardware clock without becoming hardware. *See Broadcom Corp. v. ITC*, 28 F.4th 240, 252 (Fed. Cir. 2022) (affirming finding "hardware and software could directly control power management, including through clock gating").

Courts construing "controller" terms likewise reject implementation-specific restrictions absent lexicography or clear disclaimer. *See The Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 676 F. App'x 980, 985 (Fed. Cir. 2017) (reversing construction that read a "self-aware" limitation into "controller"); *Intell. Ventures I LLC v. Altera Corp.*, No. 10-1065-LPS, 2013 WL 3913646, at *8–9 (D. Del. July 26, 2013) (construing "[a] controller . . . configured to independently vary a clock frequency of each whole processor unit" to encompass "hardware or software that controls a circuit or system"). Marvell identifies no definition or disclaimer that narrows "power controller" to a hardware-only implementation.

Marvell's appeal to the specification does not bridge the gap. Marvell looks to power control units ("PCUs") in Figures 6 and 7, and specifically to "power sharing logic" that it claims must be "concrete hardware component[s]" in those PCUs. Def.'s Br. at 10. Marvell is incorrect. The '316 Patent explicitly distinguishes between "hardware" and "logic." *See* '316 Pat., 1:54–56 (defining "domain" as "a collection of hardware *and/or logic* . . .") (emphasis added). And, in any event, the patent's description is permissive: PCU 355 "*may* include a power sharing logic 359" and PCU 455 "*can* include . . . power sharing logic 459." '316 Pat., 8:33–34, 9:41–42 (emphases added). Such permissive language falls well short of "expressions of manifest exclusion or

restriction, representing a clear disavowal of claim scope," *Thorner*, 669 F.3d at 1365–66 (citation omitted), and does not narrow the claim language. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843–44 (Fed. Cir. 2010) (noting permissive language was not a clear disclaimer).

The '316 specification instead places software, firmware, and operating-system actors inside the PCU control loop. *See* '316 Pat., 3:63–66 (describing "user-level software" determining how the package power budget is shared between domains); *id.*, 4:54–59 (describing "a graphics driver, which is *software and/or firmware*," making frequency requests to a PCU) (emphasis added); 4:67–5:3 (contemplating "OS or driver software" reducing per-domain policy values); 10:62–65 ("[e]mbodiments may be implemented in code . . . stored on a non-transitory storage medium having stored thereon instructions which can be used to program a system to perform the instructions"). Marvell's hardware-only reading excludes control arrangements the specification repeatedly uses to explain the invention, a result the Federal Circuit has called "rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

The extrinsic record, including Marvell's own exhibits, also defeats Marvell's attempt to restrict "power controller" to hardware alone. *See Phillips*, 415 F.3d at 1318. Marvell's Exhibit E is a useful example. Although Intel's SpeedStep press release describes modes that change both frequency and voltage, it also explains that Intel developed both hardware and software components to make the technology work, including system BIOS and end-user interface software. Def.'s Br., Ex. E (Dkt. 44-6) at MARVEL00014677. That is consistent with Intel's *Software Developer's Manual*, which describes Enhanced Intel SpeedStep Technology as providing "software interfaces that control the operating frequency and voltage of a processor." *See* Ex. A hereto, § 13.2, at PUB_DPMT00005762. Marvell's Exhibit F likewise classifies power-management techniques at both hardware and software levels and explains that there are "strong reasons to shift the

implementation to the software level" through the ACPI specification. Def.'s Br., Ex. F (Dkt. 44-7) at MARVEL00014594, MARVEL00014602. The official ACPI specification likewise defines "Power Management" as "Mechanisms in *software and hardware* . . . ." *See* Ex. B hereto at PUB_DPMT00006592 (emphasis added). Marvell's Exhibit G says "[u]nder software control, both the voltage and the frequency of the processor can be modified." Def.'s Br., Ex. G (Dkt. 44-8) at MARVEL00014652. And Marvell's Exhibit H describes "an MPC power controller" that can be "implemented in service processor firmware," and a prototype controller implemented "as a C++ program running on a different processor." Def.'s Br., Ex. H (Dkt. 44-9) at MAR-VEL00014661, MARVEL00014667. Marvell cannot enlist exhibits that show mixed hardware and software control and then ask the Court to impose a hardware-only construction.

2. <u>Claim 8 omits voltage. Marvell cannot put it back.</u>

Claim 8 recites, as a discrete step, "controlling a frequency of the first domain and a frequency of the second domain based on the allocated portions." '316 Pat., cl. 8. Voltage is conspicuously absent—and particularly because Claim 1 of the same patent expressly recites "each of the first and second domains to operate at an *independent voltage and frequency*." *Id*., cl. 1 (emphasis added). Under settled Federal Circuit law, "when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003); *accord Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983) ("Courts may not introduce into a claim limitations which are explicitly contained in other claims."). The presumption is strong where, as here, the omitted limitation appears in a sister independent claim. Then, claim differentiation "takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380–81 (Fed. Cir. 2006); *accord Seachange Int'l, Inc. v. C-COR, Inc.*, 413

F.3d 1361, 1369 (Fed. Cir. 2005) ("there is still a presumption that two independent claims have different scope when different words or phrases are used in those claims"). Importing "voltage" into Claim 8's express frequency-only step would render Claim 1's express "voltage and frequency" recital surplusage, which is improper. *See Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014) (refusing to read "application" program qualifier from independent claim 18 into parallel independent claim 1 reciting only "program"); *Biosonix, LLC v. Hydrowave, LLC*, 230 F. Supp. 3d 598, 607–09 (E.D. Tex. 2017) (refusing to import a "speaker/hydrophone capability" qualifier from independent claims 1 and 45 into parallel independent claim 4); *Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:11-CV-492-RWS-KNM, 2017 WL 5180347, at *4 (E.D. Tex. Oct. 18, 2017) (refusing importation of a "low level" current qualifier from independent claim 6 into parallel independent claim 21 that recited only "current" because it "would render the word 'low' in 'low level current' (of Claim 6) superfluous") (citation omitted).

Marvell's reliance on *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359 (Fed. Cir. 2007), inverts the doctrine *PODS* announces. *PODS* held that the same term—"carrier frame"—carries the same meaning across two claims that both use it. *See id.* at 1366. It did not authorize courts to lift a separate phrase from one claim (Claim 1's "independent voltage and frequency") and pour it into another claim (Claim 8) that omits the phrase entirely. Claim 8 is not silent; it speaks, and what it says is "controlling a frequency." Folding "voltages and frequencies" into the noun "power controller" would also render Claim 8's discrete "controlling a frequency" step partially superfluous within Claim 8 itself. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (construing term to avoid "render[ing] other parts of the claim superfluous"). And Marvell's only intrinsic response—a Figure 1 flowchart block describing "one embodiment," '316 Pat., 5:11–13, Fig. 1—is insufficient under *Thorner* to redefine the claim. *See* 669 F.3d at 1365–66.

Indeed, the specification confirms that power may be controlled through frequency adjustment alone. For example, the specification speaks only in terms of frequency when it states that "one or more domains may be controlled to enter into a turbo mode in which a frequency can be raised above the guaranteed frequency." '316 Pat., 3:18–21. Similarly, the description of the Figure 1 flowchart says that domains "can be updated based on the allocated portion of the power budget" by adjusting "a frequency *and/or* voltage," *id*., 5:37–39 (emphasis added), thus expressly contemplating frequency adjustment alone via the disjunctive "and/or." *See also id.*, 5:3–10 ("a percentage of the package budget . . . can be allocated to each of the domains by controlling their frequency *and/or* voltage accordingly") (emphasis added). And the Abstract notes that "[i]n one embodiment, the present invention includes . . . controlling a frequency of the domains based on the allocated portions," confirming that Claim 8's frequency-only framing was deliberate. *Id*., Abstract.

Marvell's own exhibits again further undercut Marvell's argument. Its Exhibit F confirms that "the CPU frequency can be adjusted separately" from voltage, even while observing that voltage scaling is usually used with frequency scaling for larger power savings. Def.'s Br., Ex. F (Dkt. 44-7) at MARVEL00014600. Its Exhibit G likewise treats dynamic voltage scaling and dynamic frequency scaling as separately controllable mechanisms: at a given supply voltage, "the frequency of the core can be varied," and the clocks to individual cores can "be modified dynamically and individually." *Id.*, Ex. G (Dkt. 44-8) at MARVEL00014650–51. Its Exhibit G also describes clock gating, clock freezing, hibernation, and Cryo standby modes as additional power-management techniques not reducible to simultaneous voltage-and-frequency control. *Id*. at MARVEL00014651–52. Its Exhibit H refers to changing per-core DVFS levels through a "CPU Frequency Modulator," instead of voltage. *Id.*, Ex. H (Dkt. 44-9) at MARVEL00014667. These exhibits do not justify importing "voltage" into Claim 8's frequency-only language.

Marvell's reliance on Daedalus's infringement contentions (Def.'s Br. at 12) fails. Infringement contentions are not evidence "as of the effective filing date of the patent application" and cannot retroactively redefine claim terms. *Phillips*, 415 F.3d at 1313. Nor are they part of the intrinsic record. In any event, extrinsic evidence cannot vary the intrinsic record, *see id.* at 1317–18, and the fact that the accused products practice more than the claim recites—here, implementing DVFS rather than frequency scaling alone—does not retroactively expand or alter the claim scope. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed. Cir. 2006) ("claims may not be construed with reference to the accused device") (citations omitted). That the accused products use DVFS is a question for infringement, not claim construction.

### 3. Marvell's additional language is redundant of Claim 8.

Marvell seeks to include "of a first domain and a second domain of a multi-domain processor" in its construction. Claim 8 already recites that the method is performed "in a power controller of a multi-domain processor." '316 Pat., cl. 8. Repeating the same words inside the construction does not aid the jury. The Court should decline to include them.

The Court should construe "power controller" to carry its plain and ordinary meaning.

### B. U.S. Patent No. 8,769,316, Claims 8–12, "a first domain and a second domain"

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Marvell |
|---|---|---|---|
| "a first domain and a second domain" | '316 Patent, claims 8–12 | Plain and ordinary meaning, with the agreed specification lexicography that "domain" means "a collection of hardware and/or logic that operates at the same voltage and frequency point" ('316 Pat. at 1:54–56) | "A first collection of hardware and/or logic and a second collection of hardware and/or logic, wherein each domain is configured to operate at different voltage and frequency points" |

The parties agree on the lexicography. The '316 specification defines "domain" as "a collection of hardware and/or logic that operates at the same voltage and frequency point." '316 Pat.,

1:54–56. Marvell concedes the definition controls. Def.'s Br. 16–17. Because "first" and "second" are terms that are readily apparent to lay judges and other laypersons, that should end the inquiry. *See Phillips*, 415 F.3d at 1314.

Marvell instead asks the Court to bolt a cross-domain qualifier onto the agreed definition: "wherein each domain is configured to operate at different voltage and frequency points." Def.'s Br. at 14. This qualifier has no home. It is absent from the lexicography Marvell accepted; it is absent from Claim 8; it excludes preferred embodiments of the patent; and it is refuted by Marvell's own extrinsic evidence. Marvell's qualifier should be rejected.

### 1.    Claim 8's text omits the cross-domain limitation Marvell seeks to import.

Claim 1 of the '316 Patent expressly recites "a first domain and a second domain, *each of the first and second domains to operate at an independent voltage and frequency*." '316 Pat., cl. 1 (emphasis added). Claim 8 omits that language. Claim 8 instead recites "[a] multi-domain processor including . . . a first domain and a second domain" and separately requires the power controller to perform a step of "controlling a frequency of the first domain and . . . the second domain." *Id.*, cl. 8. Voltage is gone. The cross-domain "independent" qualifier is gone. The patentee knew how to write the limitation Marvell now wants and chose not to. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Tandon Corp. v. ITC*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

The same Federal Circuit rule that bars Marvell from reading "voltage" into Claim 8 from Claim 1—set forth *supra*, Part III.A.2—bars Marvell from reading Claim 1 into Claim 8 here. Where, as in both contexts, the disputed limitation appears expressly in one independent claim and is omitted from a parallel independent claim, claim differentiation "takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous." *Curtiss-Wright*, 438 F.3d at 1380–81; *see also Ancora*, 744 F.3d at

- 11 -

735 (rejecting importation of term from parallel independent claim); *Network-1 Techs.*, 2017 WL 5180347, at *4 (same); *Biosonix*, 230 F. Supp. 3d at 607–09 (same). If Claim 8's bare reference to "a first domain and a second domain" already required different operating points, Claim 1's express "each of the first and second domains to operate at an independent voltage and frequency" recital would do no work—the precise surplusage the Federal Circuit forbids. Marvell identifies no specification or prosecution history dictating a contrary result.

Marvell's reliance on *PODS*, 484 F.3d at 1366 (Def.'s Br. at 15–16), is again misplaced. *PODS* held that a single shared term carries the same meaning in two claims that both use it. *Id*. It did not authorize a court to take a separate limitation recited only in one claim and pour it into another—the inverse of its actual holding. To be precise, Marvell does not argue that "first domain" carries a different meaning in Claim 8 than in Claim 1; both parties agree on what "domain" means. What Marvell actually argues is that a multi-word limitation ("each . . . to operate at an independent voltage and frequency") that appears only in Claim 1 must be imported into Claim 8—a move *PODS* never sanctioned. *Katrinecz v. Motorola Mobility LLC*, No. 1:12-CV-235-LY, 2014 WL 60328 (W.D. Tex. Jan. 6, 2014), fares no better. There, the court applied the parties' agreed construction of the shared modifier "optically transmissive" to a second claim element that contained the verbatim phrase. *See id.* at *5. Because the agreed lexicography of "domain" here shares no word with Marvell's proposed cross-domain qualifier, *Katrinecz* does not apply.

Marvell's qualifier also overshoots Claim 1 itself. Claim 1 recites "an *independent* voltage and frequency" (emphasis added), that is, each domain's voltage and frequency is set separately from the other's. Marvell's qualifier requires "*different* voltage and frequency points"—that is, two values that cannot coincide. Of course, two domains can be set *independently* to the same voltage and frequency point, but Marvell's qualifier excludes that. Marvell's proposal is thus doubly

- 12 -

improper: it lifts a phrase from Claim 1, substitutes a narrower word, and pastes the narrower version into a claim that contains neither the original phrase nor the narrower word.

### 2.    The specification does not require Marvell's qualifier.

The patentee defined a domain as "a collection of hardware and/or logic that operates at the same voltage and frequency point." '316 Pat., 1:54–56. That definition says nothing about how one domain compares to another. Marvell cannot read a relative requirement into a sentence that contains no such comparison, nor can Marvell find support for such a requirement anywhere else in the specification. Where the description does discuss cross-domain voltage and/or frequency differences, it does so with permissive language. *Id.*, 8:23–25 ("each such core *may* be of an independent power domain and *can* be configured to operate at an independent voltage and/or frequency") (emphases added); *id.*, 9:17–19 ("Each of domains 410 and 420 *may* operate at different voltage and/or power.") (emphasis added). The use of the permissive term "may" does not rise to the level of a clear and unambiguous disclaimer. *See i4i*, 598 F.3d at 843–44 (noting permissive language was not a clear and unambiguous disclaimer); *see also Thorner*, 669 F.3d at 1365–66.

### 3.    The extrinsic evidence also repudiates Marvell's construction.

The extrinsic evidence reveals that Marvell's construction actually inverts the meaning of "domain." In industry usage and across the controlling power-management standards, a "domain" is identified by what its members share ***internally*** (a common voltage and frequency operating point), not by how the domain differs from any other domain.

Marvell's own exhibits confirm that industry power-management practice does not require different controlled cores or groups of cores always to operate at different DVFS levels. Marvell's Exhibit H explains that "some processors have two cores coupled together and so their DVFS levels can only be changed to the same level," Def.'s Br., Ex. H (Dkt. 44-9) at MARVEL00014660, and later explains that "two or more cores may need to have the same DVFS level due to

- 13 -

application requirements or hardware limitations." *Id.* at MARVEL00014664. At best, these passages support the proposition that cores within a domain share DVFS levels, but they do not support the separate proposition that different domains must always operate at different levels. Marvell cannot enlist exhibits that fail to support the construction it asks the Court to adopt. In any event, extrinsic evidence may not contradict the intrinsic record. *See Vitronics*, 90 F.3d at 1584–85.

The controlling industry standard is to the same effect. The contemporaneous ACPI standard defined multi-processor "domains" as groups of logical processors that ***share*** a common voltage and frequency operating point. *See* Ex. B at PUB_DPMT00006869 ("Platforms containing logical processors with cross-processor dependencies . . . use ACPI defined interfaces to group logical processors into what is referred to as a dependency domain. . . . OSPM must transition all logical processors in the dependency domain to the particular target state."); *see also id.* at PUB_DPMT00006767 ("clock domain" defined as a "unique identifier representing the hardware clock source providing the input clock for a given set of processors").

The Court should adopt the term's plain and ordinary meaning, with the agreed specification lexicography that "domain" means "a collection of hardware and/or logic that operates at the same voltage and frequency point."

### C.    U.S. Patent No. 10,372,197, Claims 1–2, "workload configuration input," Claim 15, "workload configuration value"

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Marvell |
|---|---|---|---|
| "workload configuration input regarding a workload" | '197 Patent, claims 1–2 | No construction necessary | "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g. non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive)" |
| "workload configuration value" | '197 Patent, claim 15 | | |

U.S. Patent No. 10,372,197 (the "'197 Patent" or "'197 Pat.," Dkt. 25-1; *see also* Dkt. 44-3), is titled "User Level Control of Power Management Policies." No construction of "workload configuration input regarding a workload" or "workload configuration value" in the '197 Patent is necessary. These terms possess readily understandable plain meanings: an input or value relating to the configuration of a workload. Marvell's proposed construction impermissibly imports language paraphrasing one independent claim (Claim 15) into another independent claim (Claim 1), and it also imports specific examples from the specification into the claim terms as definitional limitations. It should be wholly rejected.

The ordinary meanings of the component words confirm breadth, not Marvell's narrowing. *See* Ex. C hereto at PUB_DPMT00008718 (Merriam-Webster's dictionary defining "workload" as "the amount of work or of working time expected or assigned" or "the amount of work performed or capable of being performed (as by a mechanical device) usually within a specific period."); Ex. D hereto at PUB_DPMT00008715 (OED defining "workload" as "[a] piece or quantity of work done or handled by a machine"). Nothing in those ordinary words limits a workload configuration input or value to a "predominant pattern of execution with particular hardware configuration demands," much less to Marvell's selected NUMA/UMA/IO examples.

Claim 1 recites a tuning circuit that receives "a workload configuration input regarding a workload." '197 Pat., 11:56–57. Independent claim 15 separately recites a "workload configuration value," and then supplies its own limiting language: "wherein the workload configuration value is to indicate a predominant workload type to be executed on the system." *Id.*, 13:13–15. Marvell suggests that the "claim terms are [normally] used consistently throughout [the] patent" and that claim 15's language "illuminate[s] the meaning of the same term in other claims." Def.'s Br. at 19–20 (quoting *Phillips*, 415 F.3d at 1314). As an initial matter, these are not the "same"

claim terms: one recites "workload configuration input" and the other recites "workload configuration value." "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Tandon*, 831 F.2d at 1023. Moreover, claims 1 and 15 are substantially different claims—for example, claim 15 recites multiple limitations regarding a "tuning table" and a "workload type" that are not present in claim 1—and there is simply no reason to narrow the "workload configuration input" of claim 1 by confining it to language recited in connection with a different term in claim 15. And there is no reason to construe "workload configuration value" in claim 15 when that claim already expressly recites "wherein the workload configuration value is to indicate a predominant workload type to be executed on the system."

Marvell's construction also embeds specific examples from the specification, including "NUMA," "UMA," and "I/O intensive," as hard limitations on the claim term. The specification explicitly presents these as exemplary: "***As examples***, a user can configure a workload input as non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive, ***etc.***" '197 Pat., 7:3–6 (emphases added). Marvell's construction transforms open-ended workload characterization into a rigid, enumerated taxonomy—the precise error *Phillips* forbids. *See* 415 F.3d at 1323. Indeed, *Phillips* itself held that a claim term, "baffles," was not limited to specific or preferred embodiments in the specification. *See id.* at 1324–27.

And the '197 specification's explicit use of "etc." following the NUMA, UMA, and I/O-intensive examples conclusively establishes that the list is exemplary and non-limiting. *See Blackbird Tech LLC v. ELB Elecs., Inc.*, 895 F.3d 1374, 1377–78 (Fed. Cir. 2018) (holding that specification which provided a list of fasteners ending in "etc." was non-limiting). These are merely descriptors, not a workload's "predominant pattern of execution" in the narrow sense Marvell proposes. After all, "an applicant is not required to describe in the specification every conceivable and

possible future embodiment of [the] invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001).

Taken as a whole, the '197 specification's disclosure falls far short of the clear and unmistakable surrender of claim scope required to find either lexicography or disavowal and depart from the claim terms' plain and ordinary meanings. Marvell cites *Grace Instrument Industries, LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1010 (Fed. Cir. 2023), for the proposition that "a skilled artisan would understand that the specification's descriptions . . . adequately guide the skilled artisan to the meaning of [the term]." Def.'s Br. at 21. But *Grace* concerned a term, the "enlarged chamber" of a viscometer, whose meaning was sufficiently illuminated by the specification's descriptions to avoid indefiniteness, and the Federal Circuit reversed the district court for adopting a *narrower* construction the specification did not support. *See id.* at 1008–10. The appellate court emphasized that a skilled artisan would understand the specification's descriptions of "corresponding embodiments" as guiding interpretation, rather than as defining an exhaustive list. *See id.* at 1010. "We do not read limitations from the specification into claims." *Thorner*, 669 F.3d at 1366. When "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *Proxense*, 2024 WL 2703020, at *1 (quoting *3M*, 725 F.3d at 1326). The specification's express description of the embodiments as "examples," "etc." does not turn them into requirements.

Consequently, the terms "workload configuration input regarding a workload" and "workload configuration value" do not need construction.

**D.    U.S. Patent No. 10,705,960, Claims 1, 15, 20; U.S. Patent No. 10,725,919, Claims 1, 16, 21, "multi-threaded core"**

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Marvell |
|---|---|---|---|
| "multi-threaded core" | '960 Patent, claims 1, 15, 20<br>'919 Patent, claims 1, 16, 21 | Plain and ordinary meaning | "A type of core that has hardware support for executing two or more threads at the same time/in parallel." |

U.S. Patent No. 10,705,960 (the "'960 Patent" or "'960 Pat.," Dkt. 25-2; *see also* Dkt. 44-4) and U.S. Patent No. 10,725,919 (the "'919 Patent" or "'919 Pat.," Dkt. 25-3; *see also* Dkt. 44-5) share a common specification.[1] The asserted claims recite pluralities of cores comprising "symmetric multi-threaded cores." '960 Pat., cls. 1, 15, 20; '919 Pat., cls. 1, 16, 21. Marvell asks the Court to construe "multi-threaded core" to mean "a type of core that has hardware support for executing two or more threads at the same time/in parallel." Def.'s Br. at 22. That construction is narrower than the claim language and narrower than the specification. The phrase "at the same time/in parallel" is a defining feature of one form of multithreading, known in the field as "simultaneous multithreading" or "SMT." But SMT is only one of three forms of multithreading that the specification identifies. Marvell's construction collapses these three species into one, excluding two other embodiments the patentee expressly disclosed. Marvell's citation to Daedalus's Rule 12 briefing only confirms that the dispute is whether Marvell may limit "multi-threaded core" to SMT-style simultaneous hardware-thread execution.[2]

The phrase's plain meaning should control. A multi-threaded core is a core designed to support multithreading, not a core limited to simultaneous or same-cycle thread execution. The Federal Circuit's own general usage of "multithreading" confirms: "Multithreading is generally

---

[1] Because the relevant specification line numbers in both patents are the same, references to the specification in this Responsive Brief will be to "'960 & '919 Pats."

[2] Marvell's confidential technical documents confirm that the accused products provide hardware support for multithreading. *See, e.g.*, Ex. H hereto at MARVEL00002368.

understood as a process by which a computer runs pieces of different 'threads' in alternating sequence so rapidly that it appears to be running all the threads simultaneously." *In re Reiffin Fam. Trust*, 340 F. App'x 651, 653 (Fed. Cir. 2009). That description tracks the patents, not Marvell's SMT-only restriction. Such a "multi-threaded core" does not cease to be designed to support multithreading merely because multithreading can be configurable, firmware-controlled, software-enabled, or disabled at a particular moment.

       1.      The claim language uses "multi-threaded cores" without any modifiers.

The claim language is the starting point. The asserted claims recite "symmetric multi-threaded cores." '960 Pat., cls. 1, 15, 20; '919 Pat., cls. 1, 16, 21. The adjective "multi-threaded" modifies "cores" and describes the cores' design or capability.

The claims do not recite "simultaneous multi-threaded cores," "SMT cores," "cores currently executing multiple threads," or "cores executing threads in the same cycle." The patentees knew how to use those narrower words. The same specification uses "simultaneous" when it means simultaneous multithreading, *see* '960 & '919 Pats., 16:36–41, and separately discusses "hardware threads" when it means hardware-thread logic. *See id.*, 3:29–32. Marvell narrows by blending the statement that "cores may be either single threaded or multi-threaded" with the separate definition of "hardware thread." Def.'s Br. at 23 (citing 3:20–21, 3:29–32) (emphases added). The first passage confirms that multi-threaded cores are a class of cores; the second defines a different term.

       2.      The specification includes time-sliced and combination multithreading.

The most important intrinsic passage explains:

> [T]he core may support multithreading (executing two or more parallel sets of operations or threads), and may do so in a variety of ways including time sliced multithreading, simultaneous multithreading (where a single physical core provides a logical core for each of the threads that physical core is simultaneously multithreading), or a combination thereof (e.g., time sliced fetching and decoding and simultaneous multithreading thereafter such as in the Intel® Hyperthreading technology).

- 19 -

'960 & '919 Pats., 16:33–41. This passage is a taxonomy. The genus is a core that supports multi-threading; the identified ways of doing so are time-sliced multithreading, simultaneous multi-threading, and combinations of the two. Marvell's construction reads the passage backwards. It uses "at the same time/in parallel" to keep simultaneous multithreading and to discard time-sliced and combination multithreading, even though the specification names all three. Such a construction excludes two preferred embodiments and is incorrect. *See Vitronics*, 90 F.3d at 1583. Nor can Marvell rely on the parenthetical phrase "executing two or more parallel sets of operations or threads" to erase the rest of the sentence. Whatever "parallel" means at that high level, the sentence immediately says the core may support that multithreading by time-slicing, by simultaneous mul-tithreading, or by a combination.

The word "support" also matters. The specification does not say that the core must issue instructions from two threads in the same clock cycle; it says the core may support multithreading, including time-slice multithreading. Hardware logic that supports software-managed or firmware-managed time-sliced multithreading fits that language. The broader specification reinforces that conclusion. It describes operating-system scheduling of "cores, hardware threads, or other logical processors" and discloses embodiments where a processing element or logical processor may be on-die processor logic capable of being independently associated with code, such as a software thread, operating system, application, or other code. *See* '960 & '919 Pats., 3:38–48. The point is not that operating-system scheduling alone creates a multi-threaded core; the point is that the spec-ification describes support and capability rather than same-cycle actual execution. A support or design-capability construction also avoids an actual-use limitation.

       3.      <u>Extrinsic evidence confirms that multithreading is broader than SMT.</u>

The field's leading textbook is in accordance with the patents. Hennessy and Patterson identify "three main hardware approaches to multithreading": (1) "fine-grained multithreading,"

in which the processor "switches between threads on each clock, causing the execution of instruc-

tions from multiple threads to be interleaved"; (2) "coarse-grained multithreading," which

"switches threads only on costly stalls"; and (3) "simultaneous multithreading (SMT)." John L.

Hennessy & David A. Patterson, *Computer Architecture: A Quantitative Approach* (5th ed. 2012)

(Ex. E hereto, hereinafter "Hennessy") at PUB_DPMT00002786–88; *accord id.* (4th ed. 2007)

(Ex. F hereto) at PUB_DPMT00001749–52. In other words, even when Hennessy is discussing

hardware approaches, it does not equate multi-threading with simultaneous in-parallel execution.

As shown in Hennessy's Figure 3.28, below, coarse-grained multithreading ("Coarse MT")

and fine-grained multithreading ("Fine MT") interleave instructions from different threads over

time; "SMT" is the separate multithreading category that issues from multiple threads in the same

cycle. Ex. E*,* Fig. 3.28 at PUB_DPMT00002787; *accord* Ex. F, Fig. 3.8 at PUB_DPMT00001751.

(The leftmost "Superscalar" represents a processor "with no multithreading support." Ex. E at

PUB_DPMT00002787.)



**Figure 3.28** How four different approaches use the functional unit execution slots of a superscalar processor.

Hennessy explains:

> The horizontal dimension represents the instruction execution capability in each
> clock cycle. The vertical dimension represents a sequence of clock cycles. An
> empty (white) box indicates that the corresponding execution slot is unused in that

- 21 -

clock cycle. The shades of gray and black correspond to four different threads in the multithreading processors. Black is also used to indicate the occupied issue slots in the case of the superscalar without multithreading support.

*Id.*, Fig. 3.28 at PUB_DPMT00002787.

Figure 3.28 of Hennessy exposes the ambiguity in Marvell's phrase "at the same time/in parallel." At a wall-clock level, coarse-grained and fine-grained multithreading both can keep more than one thread resident and making progress in the same interval. This can be seen in the figure where "Coarse MT" and "Fine MT" both switch between the execution of multiple threads over the course of multiple clock cycles, which are on a time scale of nanoseconds—an example of time-sliced multithreading. *See* Ex. E at PUB_DPMT00002787–88. At a much finer time scale, however, only SMT issues instructions from multiple threads in the same clock cycle. This can be seen in the figure where only SMT can execute multiple threads in the same clock cycle (row). *See id*. Marvell never identifies the time scale its construction uses. If it means the former, it adds nothing useful. If it means the latter, it contradicts the patent's express inclusion of time-sliced and combination multithreading.

Marvell's Bechara exhibit cuts the same way. Marvell cites Bechara as technical literature supposedly supporting its construction. *See* Def.'s Br. at 25 (citing Def.'s Br., Ex. J (Dkt. 44-11)). But the article is titled "A small footprint *interleaved* multithreaded processor for embedded systems," Def.'s Br., Ex. J (Dkt. 44-11) at MARVEL00014654 (emphasis added), and it describes a processor that "issues an instruction from a different thread at every clock cycle," *id.* at MARVEL00014655. That is fine-grained interleaving, not simultaneous issue from multiple threads in the same cycle. The sentence Marvell quotes from Bechara proves the same point: Bechara distinguishes threads executed "*in parallel* on multicore processors" from threads executed "*concurrently* on hardware multithreaded processors." *Id*. at MARVEL00014654 (emphases added). Marvell's construction collapses that distinction by demanding that a multi-threaded core execute

- 22 -

threads "at the same time/in parallel." Bechara cannot be used to exclude the kind of multithreading Bechara is about.

The Intel Hyper-Threading webpage Marvell relies on fares no better. *See* Def.'s Br., Ex. I (Dkt. 44-10). Marvell provides no evidence that this present-day webpage represents the state of the art at the patents' Dec. 28, 2012 priority application filing date. And the same page Marvell quotes for the proposition that Hyper-Threading runs threads "in parallel" (Def.'s Br. at 24–25) describes the technology as "taking advantage of idle time when the core would formerly be waiting for other tasks to complete." Def.'s Br., Ex. I (Dkt. 44-10) at MARVEL00014698. That statement at most describes exploiting otherwise idle core resources; it does not define all multithreading as same-cycle SMT. In any event, any extrinsic marketing description cannot displace the patents' specification, *see Vitronics*, 90 F.3d at 1584–85, which characterizes Intel Hyper-Threading as a "combination" of "time sliced fetching and decoding and simultaneous multithreading thereafter." '960 & '919 Pats., 16:39–41.

Accordingly, Marvell's construction should be rejected. The patents, the field's leading textbook, and Marvell's own sources all confirm that "multi-threaded core" must cover time-sliced and combination multithreading, while Marvell's construction does not. The Court should apply the plain and ordinary meaning.

**E.**    **U.S. Patent No. 10,705,960, Claims 1, 2, 5–10, 15, 16, 18–20; U.S. Patent No. 10,725,919, Claims 1, 4, 6–12, 16, 18–22, "first cluster" / "second cluster"**

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Marvell |
|---|---|---|---|
| "first cluster" | '960 Patent, claims 1, 2, 5–10, 15, 16, 18–20; '919 Patent, claims 1, 4, 6–12, 16, 18–22 | Plain and ordinary meaning | "A first group of a plurality of cores operating at a first voltage and a first frequency." |
| "second cluster" | '960 Patent, claims 1, 2, 5–10, 15, 16, 18–20; '919 Patent, claims 1, 4, 6–12, 16, 18–22 | Plain and ordinary meaning | "A second group of the plurality of cores operating at a second voltage and a second frequency that are different from the first voltage and the first frequency, respectively." |

The '960 and '919 Patents describe multicore processors organized into "virtual clusters" of cores. *See* '960 & '919 Pats., Abstract. Marvell asks the Court to construe "first cluster" and "second cluster" to require that the clusters operate at different voltage and frequency points. The construction parallels Marvell's "first domain"/"second domain" construction, *see supra* Part III.B, and it fails for the same reasons here. The real dispute is not whether the asserted claims involve groups of cores; they do. The dispute is whether Marvell may convert that structural grouping into a voltage-and-frequency operating-state requirement. It may not.

The independent claims themselves supply the relevant structure. They recite clusters of cores that are "physically proximate to one another" and use an overall-inter-core-distance comparator. For example, in Claim 1 of the '960 Patent, a "first cluster of [a] plurality of cores . . . are physically proximate to one another," a "second cluster of the plurality of cores . . . are physically proximate to one another," and "an average distance between cores in the first cluster is less than an average distance between the plurality of cores." '960 Pat., 25:8–14. Cluster identity is thus defined by physical proximity and core grouping, not by whether two clusters happen to occupy different voltage or frequency states at a given moment.

- 24 -

The same claims separately call out "a first frequency of operation" for the first cluster and "a second frequency of operation" for the second cluster—frequency, and *only* frequency. '960 Pat., cl. 1; *see also id.*, cl. 15 ("first frequency," "second frequency"); *accord* '919 Pat., cls. 1, 16. Voltage is absent. The drafters knew how to recite voltage when they wanted to: the patents' specification uses voltage language elsewhere, including in describing reductions of cluster power. *See* '960 & '919 Pats., 12:17–22. The choice to recite only "frequency of operation" forecloses Marvell's effort to write voltage back in, and the claim's structural proximity language forecloses Marvell's effort to define "cluster" by cross-cluster operating-state differences.

Marvell's recourse to the specification is also unavailing. Marvell relies on Figure 6 and on a passage at 12:17–22. *See* Def.'s Br. at 26–27. Neither supports Marvell's construction. The 12:17–22 passage describes ways a cluster's power state *may* be reduced, identifying "reducing the frequency of the virtual cluster" and, separately, "reducing the voltage of the virtual cluster," as "[e]xamples" of techniques that also include "gating power" and "other approaches known in the arts." '960 & '919 Pats., 12:17–22. The passage is disjunctive and non-exhaustive, offering frequency, or voltage, or something else. It does not say a cluster is *defined* by simultaneous adjustment of both voltage and frequency. It is the antithesis of the "expression[] of manifest exclusion or restriction, representing a clear disavowal of claim scope," that the Federal Circuit says is needed to narrow a claim term. *Thorner*, 669 F.3d at 1366 (quotation and citation omitted). Figure 6 is likewise a depiction of one operating scenario in one embodiment, not a redefinition of the cluster term. *See* '960 & '919 Pats., 12:9–43. The "exacting" lexicography and disavowal standards (including as discussed in Part III.B, *supra*) are not satisfied. *GE Lighting*, 750 F.3d at 1309.

The specification describes the clusters as "virtual clusters," and it further explains what "virtual" means: a "logical or virtual partitioning, clustering, or grouping" of cores. *See* '960 &

'919 Pats., 5:58–61; *see also id.*, 5:31–36. That clustering can be "based on physical proximity." *See id.*, 5:61–62. The patents' own definition is logical and structural, not operational and not by what voltage or frequency any core happens to occupy at any given instant. Marvell's argument confirms that reading, repeating "virtual cluster" six times in its factual background and in the specification quotes it relies on, including the very 12:17–22 passage, *see* Def.'s Br. at 4, 26–27, before Marvell quietly drops "virtual" from its argument. The patentees' deliberate use of "virtual" forecloses Marvell's attempt to redefine "cluster" as an operating voltage and frequency state.

Marvell's own exhibits from the extrinsic record further refute its premise that clustered cores must operate at different voltages and frequencies. Marvell's Exhibit H admits that "some processors have two cores coupled together and so their DVFS levels can only be changed to the same level," and that "two or more cores may need to have the same DVFS level due to application requirements or hardware limitations." Def.'s Br., Ex. H (Dkt. 44-9) at MARVEL00014660, MAR-VEL00014664; *see also* Parts III.A–B, *supra*. Exhibits F and G are consistent with the same broader point: processor power management may use voltage scaling, frequency scaling, clock gating/freezing, standby modes, cache resizing, and software/firmware control, and it does not require every controlled core or group of cores to occupy a distinct voltage-and-frequency point at every moment. See Def.'s Br., Ex. F (Dkt. 44-7) at MARVEL00014594, MARVEL00014600-02; Ex. G (Dkt. 44-8) at MARVEL00014650–52; *see also* Part III.A, *supra.*

Marvell separately argues that Daedalus's infringement contentions concede the cross-cluster voltage-and-frequency point. Def.'s Br. at 27. The argument runs the inference backward. The chart, read as Marvell quotes it, says DVFS "allow[s] different domains of the processor—such as individual cores *or* clusters—to have their own power states and budgets." *Id.* (emphasis added). The disjunction "individual cores *or* clusters" is not a concession that cluster identity is constituted

- 26 -

by cross-cluster voltage-and-frequency difference. And infringement contentions are not intrinsic evidence and do not fix claim scope in any event. *See Wilson*, 442 F.3d at 1330 ("claims may not be construed with reference to the accused device").

Marvell's cluster construction fails. The claims themselves recite specific restrictions on the "first cluster" and "second cluster," including calling out only frequency. The specification and extrinsic evidence confirm that reading. Nothing in the intrinsic or extrinsic record supports adding voltage control or a requirement that the first and second clusters operate at different voltage and frequency points. The Court should apply plain and ordinary meaning.

**F.      U.S. Patent No. 10,372,197, Claims 2–3, 5–7, 9–10, 14–16, 18–20, "is to"**

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Marvell |
|---|---|---|---|
| "is to" | '197 Patent, claims 2–3, 5–7, 9–10, 14–16, 18–20 | Plain and ordinary meaning | The term is indefinite |

Marvell challenges the phrase "is to" in certain claims of the '197 Patent as indefinite under pre-AIA 35 U.S.C. § 112 ¶ 2. Marvell carries the burden of proving indefiniteness by clear and convincing evidence. *Sonix*, 844 F.3d at 1377. It cannot. "Is to" is capability language under settled Federal Circuit precedent; the '197 claims contain no user-action recitals of the kind *IPXL* condemned; and Marvell's effort to carve "is to" out from "configured to" cannot be reconciled with the cases upholding far less explicit capability formulations. The Patent Office allowed the claims with this language after examination, and Marvell provides no evidence that any examiner, applicant, or skilled artisan ever treated "is to" as creating the hybrid-claim ambiguity *IPXL* addressed.

Each challenged limitation follows the same architecture: a recited structural component, followed by "is to" and a functional verb describing what that structure does. *E.g.*, '197 Pat., cl. 2 ("the power controller is to access a power-performance tuning table . . . "); *id.*, cl. 9 ("the processor is to receive at least one EPB value from a baseboard management controller"). Each clause

names a structure and identifies what that structure is arranged to do. That is capability language, not a method step.

Federal Circuit authority decides this issue, and Daedalus's claims are stronger than the ones the Federal Circuit has upheld as definite. In *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315 (Fed. Cir. 2017), the court upheld apparatus claims reciting a "reporting module" that "presents," "receives," and "generates" (bare active verbs with no signal-phrase prefix at all) as "permissible functional language used to describe capabilities" of the recited structure. The '197 patentees did one better: they used "is to," which expressly signals what the recited structure is arranged to do. The broader Federal Circuit line confirms that this architecture is capability language. In *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826–27 (Fed. Cir. 2016), the court held that "data generating" limitations tied to "an image sensor" "only indicate that the associated structures have this capability . . . and do not require that any data be actually generated by the user." *Accord Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1371–72, 1375 (Fed. Cir. 2008) (holding apparatus claim comprising pipeline stages "performing," "producing," and "determining" was definite; it was "clearly limited to a pipelined processor possessing the recited structure and capable of performing the recited functions"); *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1358, 1361–62 (Fed. Cir. 2018) (construing apparatus claim comprising "[structure] to [verb]" terms). "Is to [verb]" uses the infinitive marker explicitly, making it at least as clearly capability-coded as bare active verbs.

*IPXL* and its progeny bar a different kind of claim entirely: those requiring action by a user or external actor. In *IPXL*, the claim recited "the user uses the input means," which the Federal Circuit held indefinite because it left "unclear whether infringement . . . occurs when one creates a system that allows the user to" perform the act, or only when "the user actually uses" it. *IPXL*

- 28 -

*Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). In *Katz*, the claims recited that "certain of said individual callers digitally enter data," language the court held "directed to user actions, not system capabilities." *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011). In *H-W Technology*, the claim recited method steps like "wherein said user completes" and "wherein said user selects." *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335–36 (Fed. Cir. 2014). Marvell also cites two district-court decisions involving an apparatus claim reciting a human operator's use of a stethoscope, and coffee-brewing apparatus claims reciting physical user acts of basket insertion and operator-driven heating, respectively. *See Lecat's Ventriloscope v. MT Tool & Mfg.*, 351 F. Supp. 3d 1100, 1113 (N.D. Ill. 2018); *Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*, No. 13-2012-SLR, 2015 WL 7295436, at *4–5 (D. Del. Nov. 18, 2015). The common thread in every case finding indefinite hybrid claims is the presence of a human actor whose volitional conduct triggers the ambiguity—a user "uses," callers "enter," an operator inserts a basket. The '197 claims contain nothing of the sort. They describe automated processor operations such as "the power controller is to access a power-performance tuning table," '197 Pat., cl. 2, without any human in the loop. The Federal Circuit has already drawn the dispositive distinction on materially identical facts: "Unlike the claims in *IPXL* and *Katz*, the claims do not recite functionality divorced from the cited structure." *UltimatePointer*, 816 F.3d at 827–28.

Marvell's only attempt to escape this line of authority is to argue that "is to" lacks the magic words "configured to" or "adapted to" that the Federal Circuit has treated as permissible capability formulations. Def.'s Br. at 30. The argument fails on its own cited authority. *UltimatePointer* upheld "image sensor generating data," with no "configured to" prefix at all. *See* 816 F.3d at 826–27. *MasterMine* upheld bare "presents," "receives," and "generates," with no linking phrase at all.

- 29 -

*See* 874 F.3d at 1315. *ParkerVision* readily interpreted "[structure] to [verb]" constructions in the same structural-capability terms the '197 claims use. *See* 903 F.3d at 1358, 1361–62. Marvell's premise that capability claiming requires a particular signal-phrase prefix is precisely the kind of rigid formalism the Federal Circuit has rejected. If naked active verbs satisfy definiteness, "is to [verb]," which explicitly uses the infinitive marker to identify the recited function as a structural capability, *a fortiori* does too. The ordinary English meaning of the phrase confirms the same. The Oxford English Dictionary defines the "be" + infinitive construction as expressing "appointed or arranged future action; (hence also) . . . necessity, obligation, duty, fitness, or appropriateness." Ex. G hereto, § IV.18 at PUB_DPMT00008418. "Is to access" thus means "is arranged to access" or "is designed to access": capability and purpose, not present-tense operation.

The '197 specification's own usage confirms the capability reading as it repeatedly describes "is to" activities in "can" form. For example, the specification teaches that "a sampler 110 . . . *can receive* incoming EPB values from the various cores . . . ,'" '197 Pat., 5:1–2, and Claim 5 recites that "the sampler *is to receive* the EPB value . . . ." (emphases added). The specification teaches that a power controller bin value "*can be used to access* a power/performance table . . . ," *id*., 6:18–19, and Claim 2 recites that "the power controller *is to access* a power-performance tuning table . . . ." (emphases added). The specification teaches that "one or more settings for the feature *can be updated* in the PCU," *id.*, 8:26–27, and Claim 3 recites that "the tuning circuit *is to update* the at least one setting . . . ." (emphases added).  A person of ordinary skill in the art reading those "can" verbs in the specification and the corresponding "is to" verbs in the claims would understand them as analogous, describing what the apparatus is built to do.

The Court should reject Marvell's indefiniteness challenge.

## IV.   CONCLUSION

For the foregoing reasons, plaintiff Daedalus's constructions should be adopted.

Dated: June 1, 2026

Respectfully submitted,

*/s/ Richard Koehl*

Garland Stephens
  LEAD ATTORNEY
  Texas Bar No. 24053910
  garland@bluepeak.law
Justin Constant
  Texas Bar No. 24067551
  justin@bluepeak.law
Richard Koehl
  Texas Bar No. 24115754
  richard@bluepeak.law
John Brinkmann
  Texas Bar No. 24068091
  john@bluepeak.law
**BLUE PEAK LAW GROUP LLP**
3139 West Holcombe Blvd, PMB 8160
Houston, TX  77025
Telephone: 281-972-3036


Robert Magee
  California Bar No. 271443
  robert@bluepeak.law
**BLUE PEAK LAW GROUP LLP**
3790 El Camino Real, PMB 846
Palo Alto, CA  94306-3314
Telephone: 281-972-3036

Heng Gong
 New York Bar No. 4930509
 heng@bluepeak.law
**BLUE PEAK LAW GROUP LLP**
PO Box 20006
New York, NY 10025-1510
Telephone: 281-972-3036

*Of Counsel:*
Mark D. Siegmund
State Bar No. 24117055
**CHERRY JOHNSON SIEGMUND JAMES PLLC**
Bridgeview Center

- 31 -

7901 Fish Pond Road, 2nd Floor
Waco, Texas   76710
Telephone: (254) 732-2242
Facsimile:  (866) 627-3509
msiegmund@cjsjlaw.com

William D. Ellerman
Texas Bar No. 24007151
**CHERRY JOHNSON SIEGMUND JAMES PLLC**
One Glen Lakes Tower
8140 Walnut Hill Lane, Suite 105
Dallas, Texas 75231
Telephone: (254) 732-2242
Facsimile: (866) 627-3509
Email: wellerman@cjsjlaw.com

*Attorneys for Plaintiff Daedalus Prime LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ *Richard Koehl*