**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| DAEDALUS PRIME LLC<br>　　　　Plaintiff<br><br>v.<br><br>MARVELL TECHNOLOGY, INC.<br>　　　　Defendant | Civil Action No.: 1:26-cv-00081-ADA |

**MARVELL TECHNOLOGY, INC.'S REPLY CLAIM CONSTRUCTION BRIEF**

## I.     INTRODUCTION

The claims, viewed in light of the intrinsic and, where appropriate, extrinsic evidence, confirm that Defendant Marvell Technology, Inc.'s ("Marvell") proposed constructions should be adopted. Plaintiff Daedalus Prime LLC's ("Daedalus") Response Brief and supporting evidence further underscore the propriety of Marvell's constructions and the deficiencies in Daedalus' positions. The intrinsic record consistently supports Marvell's interpretations, while Daedalus fails to provide objective boundaries for the disputed claim language. Accordingly, the Court should adopt Marvell's proposed constructions and reject Daedalus' unsupported interpretations, which are inconsistent with the record and claim-construction principles.

## II.    ARGUMENT

### A.     The Disputed Terms Should Be Construed Consistent with the Claims, Specification, and Federal Circuit Precedent.

Daedalus repeatedly invokes "plain and ordinary meaning" without resolving the parties' claim-scope disputes. When the parties dispute the scope of a claim term, the Court must resolve that dispute. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360-61 (Fed. Cir. 2008). If the "ordinary" meaning does not resolve the dispute, the term must be construed. *See id.* at 1361. Regardless, plain and ordinary meaning is not assessed in the abstract, as it is understood in the context of the claims and specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005).

Moreover, claim differentiation "works best in the relationship between independent and dependent claims," and it "is a guide, not a rigid rule." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006) (internal quotation marks omitted). Across independent claims, the doctrine does not apply where it would create an inconsistency with the specification. *See id.* at 1381. Like the Federal Circuit, this Court should decline to apply claim

1

differentiation across independent claims where the claims are not otherwise identical in scope. *See Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1358 (Fed. Cir. 2016).

### B.    Specific Constructions

#### 1.    "power controller" ('316 Patent, claim 8)

##### a.    The "power controller" is a hardware controller.

Daedalus' hardware arguments rest on a false dichotomy. *See* Dkt. No. 45 ("Pl.'s Br.") at 4-7. Marvell's construction does not exclude software, firmware, drivers, or operating-system policies from interacting with or running on the claimed power controller. It simply recognizes that the "power controller" itself is a hardware controller "of a multi-domain processor," not software or firmware only. Dkt No. 44 ("Def.'s Br.") at 8. That is what claim 8 says. Daedalus' contrary reading improperly divorces the claim language from the processor architecture described in the patent and should be rejected.

The specification confirms Marvell's reading. The '316 Patent repeatedly identifies the relevant power controller as a "power control unit" or "PCU" within the processor, which is a hardware component that includes power-sharing logic that dynamically reallocates the package power budget between domains. *See* Def.'s Br. at 10-11; *see also* Ex. A[1], at 8:19-37, 9:3-47. Figures 6 and 7 likewise depict the PCU as a structural block within the processor. *See* Ex. A, at Figs. 6 and 7. Regardless of whether software or firmware provides inputs to, or runs on, the PCU, the patent shows that the "power controller" is hardware within a multi-domain processor.

*Broadcom*'s discussion of "controller" and "power management" does not help Daedalus. *See* Pl.'s Br. at 5 (citing *Broadcom Corp. v. ITC*, 28 F.4th 240, 252 (Fed. Cir. 2022)). Claim construction is patent-specific, and how terms in different, unrelated patents may be construed is

---

[1] All references and citations to exhibits are to those filed concurrently with the Declaration of Karineh Khachatourian in Support of Marvell's Opening Claim Construction Brief.

irrelevant. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005) ("A particular term used in one patent need not have the same meaning when used in an entirely separate patent, particularly one involving different technology."); *see also Phillips*, 415 F.3d at 1315. What "controller" or "power management" meant in an unrelated patent is irrelevant to the construction of "power controller" here.

Daedalus' software-related citations to the '316 Patent do not help either. *See* Pl.'s Br. at 6. The cited passages concern software or firmware that provides inputs or requests to the power controller or PCU—they do not describe the power controller itself. *See* Ex. A, at 3:63-66, 4:54-59, 4:67-5:3, 10:62-65. If anything, the patent's repeated references to software and firmware as entities that interact with the power controller underscore that the power controller is a separate component. And Daedalus admits this, stating that the passages discuss hardware and/or firmware in the "PCU control loop," not the PCU itself. Pl.'s Br. at 6. For example, the specification states that an OS, scheduler, or graphics driver, "which is software and/or firmware" "can make requests for a given frequency of operation to the PCU." Ex. A, 4:54-59. Accordingly, Daedalus' cited passage distinguishes software and firmware from the PCU, which receives and acts on the request; it does not show that the PCU is software or firmware.

### b. The "power controller" is configured to control voltages and frequencies of the domains.

Daedalus' arguments that the power controller does not control voltage and frequency ignore the intrinsic record. *See* Pl.'s Br. at 7-10. The parties agree that "domain" means "a collection of hardware and/or logic that operates at the same voltage and frequency point." *Id.* at 10-11; Def.'s Br. at 16-17. Claim 8's power controller allocates power between the "first domain" and the "second domain." Ex. A, claim 8. Thus, the relevant control targets are not generic processor blocks. Rather, they are domains defined by voltage and frequency operating

points. Marvell's construction reflects that agreed definition.

The specification confirms the same point. As Marvell explained, Figure 1 is a "high level method of performing power budget allocations between multiple domains," and the '316 Patent explains that the power sharing logic of the PCU performs that method. *See* Def.'s Br. at 12; Ex. A, 5:11-13. After the PCU determines the package power budget and allocates portions of that budget between domains, block 130 controls the domains according to that allocation by controlling their "Frequency and Voltage." *See* Def.'s Br. at 12; Ex. A, Fig. 1. Since each domain operates at certain voltage and frequency points, the power consumption of a domain is affected by both its voltage and frequency point.  As such, the claimed power controller must be able to control both the domain's voltage and frequency operating point, not merely its clock frequency, in order to keep the power consumption of the domain under its allocated power budget. And this is "consistent with" extrinsic evidence showing that dynamic power is a function of both "supply voltage" and "clock frequency." *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1331 (Fed. Cir. 2012); Def.'s Br. at 14 (citing Ex. F, MARVELL00014586).

Daedalus' claim differentiation argument does not overcome that record. *See* Pl.'s Br. at 7-9.  Claim differentiation is weakest when applying it would contradict the specification or give the same terms inconsistent meanings within the same patent. *See Indacon*, 824 F.3d at 1358; *Curtiss-Wright*, 438 F.3d at 1380-81. Moreover, claim differentiation does not permit the same "first domain" and "second domain" terms to mean voltage- and frequency-defined domains in claim 1, but other components in claim 8. *Compare* Ex. A, claim 1, *with* claim 8. Claim 1 provides claim-level context for the same domain terms that claim 8's power controller manages; it does not supply an unrelated limitation from a different invention. *See Phillips*, 415 F.3d at 1314; *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366-67 (Fed. Cir. 2007). Claims 1 and 8

are also not otherwise identical in scope: claim 1 claims a multi-domain processor architecture, while claim 8 claims a method performed by a power controller of the multi-domain processor. *Compare* Ex. A, claim 1, *with* claim 8; *see Indacon*, 824 F.3d at 1358. Reading the shared domain terms consistently, therefore, does not render claim 1 superfluous. It gives the same words the same meaning in the same patent. *See PODS*, 484 F.3d at 1366-67. That intrinsic record prevents Daedalus from recasting the claimed power controller as a clock frequency-only controller. *See Phillips*, 415 F.3d at 1315-16.

Despite Daedalus' contentions, *PODS* better addresses the proposed construction. *See* Pl.'s Br. at 8. Marvell is not importing an unrelated limitation from claim 1 into claim 8. Rather, claim 1 uses the same "first domain" and "second domain" terms that claim 8's power controller manages, and it confirms that those are domains with controlled voltage and frequency points. *See* Def.'s Br. at 8-10. That is precisely the type of claim context analysis *PODS* permits. *See PODS*, 484 F.3d at 1364, 1366-67.

Daedalus' reliance on "and/or" is also unavailing. *See* Pl.'s Br. at 9. Claim 8 expressly recites controlling frequency as one operation performed by the power controller, but the disputed term is the noun phrase "power controller," which identifies the processor-resident domain power-management controller. Ex. A, claim 8. The domains managed by that controller are not generic processor blocks; under the parties' agreed definition, they are collections of hardware and/or logic that operate at voltage and frequency points. *See* Pl.'s Br. at 10-11; Def.'s Br. at 16-17; Ex. A, at 1:54-56. Marvell's construction identifies the power controller's domain-level power management functionality in view of the claims and specification. *See Phillips*, 415 F.3d at 1315-16. The '316 Patent's repeated treatment of frequency and voltage together confirms that voltage control is part of the disclosed power controller's functionality. *See* Ex. A,

Fig. 1, 5:11-13, 5:37-39, 8:19-37, 9:3-47; Def.'s Br. at 10-14.

Finally, Marvell's extrinsic evidence confirms its proposed construction. *See* Def.'s Br. at 12-14. Daedalus mischaracterizes Marvell's exhibits by arguing that frequency can sometimes be adjusted separately from voltage. *See* Pl.'s Br. at 9-10. But the extrinsic evidence does not support a frequency-only power controller as suggested by Plaintiff. Namely, Exhibits E, G, and H discuss controlling both voltage and frequency. *See* Ex. E at MARVELL00014677 (Intel's SpeedStep "dynamically switch[es] frequency and voltage"); Ex. G at MARVELL00014647 (describing a processor using "dynamic voltage scaling and on-the-fly frequency scaling"); Ex. H at MARVELL00014660, 14667; Def.'s Br. at 13. Accordingly, the extrinsic evidence confirms that processor power controllers are configured to control both voltage and frequency operating points and is consistent with the intrinsic record. *See Aventis*, 675 F.3d at 1331.

### 2.    "a first domain and a second domain" ('316 Patent, claims 8-12)

### a.    The claims support Marvell's proposed construction.

Daedalus is wrong that claim 1's "independent voltage and frequency" language defeats Marvell's construction. *See* Pl.'s Br. at 11-12. The dispute is not whether the words "first" and "second" are understandable in isolation. *See id.* at 11. The dispute is whether the "first domain" and "second domain" are voltage- and frequency-defined power management domains. The claims, which necessarily incorporate the agreed-upon definition of "domain," confirm they are.

As discussed above, claim 8 uses the exact same "first domain" and "second domain" terms as claim 1, and does so in the same multi-domain processor context. *Compare* Ex. A at claim 1, *with* claim 8. Claim 1 confirms that the domains are defined by their voltage and frequency points, and claim 8 recites a power controller that allocates and shares a power budget between them. *See supra* Section II.B.1.b; Def.'s Br. at 15-16. Consistent usage of the same terms across claims reinforces Marvell's construction. *Phillips*, 415 F.3d at 1314; *PODS*, 484

F.3d at 1366-67. Claim differentiation does not alter this conclusion, and both *PODS* and *Katrinecz* support construing "a first domain and a second domain" consistently with claim 1 and the definition of "domain." *See PODS*, 484 F.3d at 1366-67; *Katrinecz v. Motorola Mobility LLC*, No. 1:12-CV-235-LY, 2014 WL 60328, at *5 (W.D. Tex. Jan. 6, 2014).

Daedalus' cited cases do not require otherwise. Unlike *Ancora*, *Biosonix*, and *Network-1*, Marvell relies on the same claim terms, the agreed definition of "domain," and the claim context of the same multi-domain processor. *See Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:11-cv-492-RWS-KNM, 2017 WL 5180347, at *4 (E.D. Tex. Oct. 18, 2017); *Biosonix, LLC v. Hydrowave, LLC*, 230 F.Supp.3d 598, 607-09 (E.D. Tex. 2017); *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 734-35 (Fed. Cir. 2014). As discussed, *PODS* and its progeny permit the Court to require that the same terms carry the same meaning in the same patent, including when it incorporates an agreed-upon definition of a shared term. *See PODS,* 484 F.3d at 1366-67; *see also Katrinecz*, 2014 WL 60328 at *5.

### b.    Marvell's construction is consistent with the specification.

Daedalus argues that Marvell's construction has "no home" in the specification, but that ignores the express definition of "domain." Pl.'s Br. at 10-11, 13. Marvell's construction begins with that definition and applies it to the claimed first and second domains.

The specification confirms that the domains are separate power management domains. It describes multiple independent domains, such as core and graphics domains, that share a package power budget, and Figure 1 states that the first and second domains' "Frequency and Voltage" are controlled based on the allocated budget. *See* Ex. A, 2:1-7, 5:67-6:20, Fig. 1, 5:11-13; Def.'s Br. at 15-18. Marvell therefore does not rely on a single optional embodiment; it relies on the patent's definition of "domain," the shared claim terms, and the specification's consistent description of domain-level power-budget allocation.

**c.      Extrinsic evidence is consistent with Marvell's construction.**

Daedalus misuses Marvell's extrinsic evidence. *See* Pl.'s Br. at 13-14. The extrinsic evidence does not "repudiate" Marvell's construction. *See id.* at 13. As discussed above, Marvell's evidence confirms that processor power management is understood in terms of voltage and frequency. *See supra* Section II.B.1.b; Def.'s Br. at 12-14.

Daedalus' ACPI evidence points the same way. *See* Pl.'s Br. at 14; *see also* Dkt. No. 45-3. ACPI does not use "domain" to mean any arbitrary collection of components. It defines "Power Resources" as resources such as "power planes and clock sources" required for a device to operate in a given power state determined by its voltage and clock frequency. Dkt. No. 45-3, PUB_DPMT00006592, 6767, 6869. Thus, Daedalus' own evidence confirms that processor "domains" are understood as hardware groupings tied to power resources. Reading ACPI with the '316 Patent's agreed definition of "domain" as a collection of hardware and/or logic operating at the same voltage and frequency point, ACPI supports Marvell's construction of the first and second domains as defined based on their voltage and frequency operating points.

**3.      "workload configuration input regarding a workload" ('197 Patent, claims 1-2) / "workload configuration value" ('197 Patent, claim 15)**

To streamline the issues presented to the Court, Marvell agrees with Plaintiff's proposed plain and ordinary meaning construction of the terms "workload configuration input/value."

**4.      "multi-threaded core" ('960 Patent, claims 1, 15, 20; '919 Patent, claims 1, 16, 21)**

Daedalus' response confirms the need for construction. Daedalus focuses on the process of "multithreading," but the claims recite a structure, "multi-threaded core." *See* Pl.'s Br. at 18. The term describes a type of processor core. Marvell's construction gives that term the required core-level meaning: "a type of core that has hardware support for executing two or more threads at the same time/in parallel."

8

Daedalus' proposed "plain and ordinary meaning" should be rejected because it does not resolve the parties' actual dispute. Daedalus repeatedly discusses "multithreading" generally, but the claim term is "multi-threaded core."[2] Without construction, Daedalus will be free to argue that a single-threaded core becomes a "multi-threaded core" by, *e.g.*, using software to schedule multiple software threads to be executed on it over time, rendering the distinction between "either single threaded or multi-threaded" cores meaningless. This is exemplified by Daedalus' misuse of Marvell's technical documents that clearly state "software multithreading," which can be executed on a group of single-threaded cores, not "hardware support for multithreading" as Daedalus claims. *Compare* Pl.'s Br. at 18 n.2, *with* Dkt. No. 45-9 at MARVELL00002368.

Daedalus wrongly recasts Marvell's construction as limited to cores that implement simultaneous multithreading ("SMT"). *See* Pl.'s Br. at 18. SMT is merely one embodiment mentioned in the '960 and '919 Patents, while Marvell's proposed construction encompasses all embodiments of the invention. Namely, Marvell's construction requires "hardware support for executing two or more threads at the same time/in parallel" (Def.'s Br. at 22), which is directly in line with the specification. The specification states that a core may support "multithreading (executing two or more ***parallel sets*** of operations or ***threads***)" and may do so through "time sliced multithreading, simultaneous multithreading . . . or a combination thereof." Exs. C and D, at 16:33-41 (emphasis added). The specification uses "parallel" to describe the genus of multithreading and identifies time-sliced multithreading, SMT, or a combination as ways to implement that genus. In line with this, Marvell's proposed construction encompasses all listed embodiments. Thus, Daedalus is wrong to equate Marvell's use of "at the same time/in parallel"

---

[2] Daedalus' reliance on *In re Reiffin Fam. Trust* is inapplicable because that nonprecedential case also discussed "multithreading" only. *See generally* 340 Fed. App'x 651 (Fed. Cir. 2009).

with SMT alone. *See* Pl.'s Br. at 18.

Marvell's construction is also consistent with the specification's distinction between single-threaded and multi-threaded cores, while Daedalus' "plain and ordinary meaning" would rid the '960 and '919 Patents of the distinction. The specifications state that "cores may be either single threaded or multi-threaded," and that a "hardware thread" is logic located on an integrated circuit that maintains independent architectural state while sharing execution resources. Exs. C and D, at 3:20-32. This confirms that "multi-threaded" within "multi-threaded core" is a characteristic of the core's hardware capability, *e.g.*, having two or more logical cores that share the same resources of the core and can execute two or more threads in parallel, not merely a description of software multi-threading that can be implemented on a group of single-threaded cores via operating-system scheduling. Daedalus conflates the claimed structural term "multi-threaded core," which is hardware, with the broader concept of implementing "multithreading" on a hardware core via software. *See* Pl.'s Br. at 18-23. Again, this is exemplified by Daedalus' reliance on Marvell's technical documents that state "software multithreading." *See id.* at 18 n.2. Accordingly, Marvell's construction is necessary to preserve the distinction between single-threaded and multi-threaded cores, as the term being construed here is the structural term "multi-threaded core," not the method term "multithreading."

Daedalus' reliance on the phrase "may support multithreading" does not help it. *See* Pl.'s Br. at 19-20. Distinguishing between single-threaded cores and multi-threaded cores, the '960 and '919 Patents expressly claim "multi-threaded cores." *See* Ex. C, claims 1, 15, 10; Ex. D, claims 1, 16, 21. And as discussed, the specification's only embodiments of "multithreading" are time-sliced, SMT, and a combination thereof. *See* Exs. C and D, at 16:33-41. To that end, Marvell's construction properly requires the claimed "hardware support" for all those

10

embodiments, and it does not impose an actual-use limitation as Daedalus claims. *See, e.g.*, Def.'s Br. at 22; Pl.'s Br. at 20. A core need not be executing two threads at the precise moment of infringement to be a multi-threaded core. But the claimed capability must reside in the core's hardware, as exemplified by the specification. Daedalus' "plain and ordinary meaning" proposal leaves that hardware requirement unresolved and invites the jury to confuse software multithreading with a hardware multi-threaded core.

The extrinsic evidence confirms the same distinction. Hennessy identifies "three main hardware approaches to multithreading"—fine-grained, coarse-grained, and simultaneous multithreading—confirming both that multithreading is not limited to SMT and that a multi-threaded core requires hardware support. *See id.* at PUB_DPMT00002786; *see also* Pl.'s Br. at 21-22. Bechara likewise describes an "interleaved multithreaded processor with 2 hardware thread contexts" and explains that a "hardware multithreaded processor" provides "hardware resources and mechanisms to execute several hardware threads on one processor core." *See* Ex. J, at MARVELL000014654. That is the distinction Marvell's construction captures.

Likewise, Daedalus' reliance on the specifications' discussion of operating-system scheduling is an overreach. *See* Pl.'s Br. at 20. The cited passage says only that, once hardware execution resources exist, software may schedule work to "cores, hardware threads, or other logical processors." *See* Exs. C and D, at 3:38-48. That is not a definition of "multi-threaded core," and it does not say that software scheduling can transform a single-threaded core into a multi-threaded one. *See id.* To the contrary, the passage confirms that the scheduler operates on existing hardware resources exposed by the core; it does not provide the hardware support that necessarily makes a core "multi-threaded." *See id.*

     5.     **"first cluster" / "second cluster" ('960 Patent, claims 1-2, 5-10, 15-16, 18-20; '919 Patent, claims 1, 4, 6-12, 16, 18-22)**

Daedalus' "plain meaning" position leaves unresolved the parties' actual dispute: whether the claimed clusters are merely proximity-based groupings of cores or cluster-level power-management units. The claims and specification confirm the latter.

### a.    The claim language supports Marvell's proposed construction.

Daedalus argues that the claims define clusters only by physical proximity, but this is incomplete and ignores the power-management functionality of the patents. *See* Pl.'s Br. at 24-26. The claims recite that cores within a cluster are physically proximate to one another, but they also recite "***power management* circuitry**" that enables a "first frequency of operation" for the first cluster and a "second frequency of operation" for the second cluster, and that "selectively ***gate[s] power***" to the first and/or second clusters and their corresponding distributed cache portions. Ex. C, claim 1 (emphasis added); Ex. D, claim 1 (emphasis added). Thus, the claims do not use "cluster" as a label simply for any nearby group of cores. They identify the clusters as the units to which cluster-level power control is applied.

The claim language also confirms that each cluster must be a group of cores, not a single core. The claims refer to "cores in the first cluster" and compare the "average distance between cores in the first cluster" to the average distance across the plurality of cores. Ex. C, claims 1, 15, 20; Ex. D, claims 1, 16, 21; *see also* Def.'s Br. at 26. A single core has no "distance between cores." *See* Def.'s Br. at 26. Marvell's construction properly captures that the first and second clusters are groups of cores drawn from the plurality of cores.

Daedalus' argument that the claims only mention frequency and omit voltage does not defeat Marvell's construction. *See* Pl.'s Br. at 25. The claims recite first and second cluster frequencies because frequency is one power-management parameter enabled by the power-management circuitry; they do not define "cluster" solely by frequency or reduce clusters to proximity-only groupings. *See* Ex. C, claims 1, 15, 20; Ex. D, claims 1, 16, 21. The claims'

power management circuitry, first and second cluster-level frequencies, and selective power gating show that clusters are units of power management. *See* Ex. C, claim 1; Ex. D, claim 1. The specification's discussion of power management confirms that those same clusters operate at cluster-level power states controlled through both voltage and frequency, as discussed further *infra*. *See, e.g.*, Exs. C and D, at Fig. 6, 12:9-22. Marvell's construction captures that claim-specific use of "first cluster" and "second cluster." *See Phillips*, 415 F.3d at 1315-16.

### b.    The specification confirms cluster-level power states.

Daedalus' argument that Fig. 6 and column 12 only show that a cluster's voltage and frequency may be reduced is unavailing. *See* Pl.'s Br. at 25-26. The specification consistently describes "virtual clusters" as logical groupings of cores and corresponding cache slices, and explains that they may be operated in different power-consumption states. *See, e.g.*, Exs. C and D, 5:31-62, 12:9-43. Although column 12 discusses only reducing frequency and voltage, and selective gating power, it nonetheless expressly ties both voltage and frequency to the higher and lower power-consumption states of the two virtual clusters—and the specifications describe that "higher" and "lower" are "relative" terms to one another, meaning that voltage and frequency must vary to be different virtual clusters. *See* Exs. C and D, 12:9-17.

Figure 6 is directly tied to the disputed terms, and Daedalus is wrong to dismiss it as embodiment-only material. *See* Pl.'s Br. at 25-26. Figure 6 depicts a first virtual cluster in a higher power-consumption state and a second virtual cluster in a lower power-consumption state, while "higher" and "lower" are relative terms to one another. *See* Exs. C and D, Fig. 6, 12:9-22. The specification explains that the lower-power state may be achieved by "reducing the frequency of the virtual cluster," "reducing the voltage of the virtual cluster," and selectively gating power, all of which directly tie voltage and frequency to those relative states. *Id.* at 12:17-22. This is particularly enlightening, as the relative claims expressly claim power management

circuitry operative to selectively gate power. *See supra* Section II.B.5.a. As explained, those disclosures show that the patents treat clusters as groups of cores operated at cluster-level voltage and frequency points. *See* Def.'s Br. at 26-27. This properly reads the disputed terms in light of the specification. *See Phillips*, 415 F.3d at 1315-16.

Daedalus' reliance on the word "virtual" misses the point. *See* Pl.'s Br. at 25-26. The same passages that describe virtual or logical clustering also describe operating those virtual clusters in different power-consumption states, reducing the frequency of a virtual cluster, reducing the voltage of a virtual cluster, and selectively gating power to the virtual cluster. Exs. C and D, at 5:31-62, 12:9-43. Thus, "virtual" does not help Daedalus.

> **c.**     **The extrinsic evidence does not support "plain and ordinary meaning."**

Daedalus' extrinsic evidence argument rests on the wrong premise. *See* Pl.'s Br. at 26-27. Marvell's proposed construction is based on how the '960 and '919 Patents use the paired terms "first cluster" and "second cluster." *See* Def.'s Br. at 26-27.

Exhibits F and G do not undermine that construction. Rather, they show that processor power management may employ multiple techniques with voltage and frequency being central parameters for processor operating states. *See* Ex. F, MARVELL00014586, 14600-02; Ex. G, MARVELL0001647-48, 14650-52.

Exhibit H likewise supports Marvell, not Daedalus. Daedalus emphasizes that Exhibit H discusses cores whose DVFS (dynamic voltage and frequency scaling) levels may be coupled or changed to the same level. *See* Pl.'s Br. at 26-27. But that shows why voltage and frequency operating points matter to cluster identity, as cores constrained to the same DVFS level are part of the same power-managed operating group. Exhibit H therefore confirms that, in multicore power management, core clusters are understood by reference to shared or distinct DVFS

operating points. That is the same distinction reflected in Marvell's construction.

Daedalus' contrary reading would reduce "cluster" to physical proximity alone and leave the jury without guidance on the parties' actual dispute. *See* Pl.'s Br. at 24-26; *O2 Micro*, 521 F.3d at 1360-61. Marvell does not dispute that physical proximity is part of the claim language. But the asserted claims do more than locate cores near one another. They apply cluster-level power-management circuitry to those groups, assign different cluster-level frequencies, and selectively gate power to the clusters and corresponding cache portions. Ex. C, claims 1, 15, 20; Ex. D, claims 1, 16, 21; *see* Def.'s Br. at 25-27. Marvell's constructions are therefore necessary to prevent Daedalus from treating any proximity-based grouping of cores as the claimed first and second clusters. *See Phillips*, 415 F.3d at 1315-16; *O2 Micro*, 521 F.3d at 1361.

## C.    Indefiniteness

### 1.    "is to" ('197 Patent, claims 2-3, 5-7, 9-10, 14-16, 18-20)

Several claims in the '197 Patent claim an apparatus, processor, or machine-readable medium, but then recite what the claimed article "is to" do. *See, e.g.*, Ex. B, claims 2, 15. That formulation does not provide reasonable certainty whether the limitation is claiming intended use, future action, capability, structure, or actual performance. That creates the uncertainty *IPXL* forbids: whether infringement occurs when the claimed article is made or sold, or only when it actually performs the recited operations. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).

## III.    CONCLUSION

For the foregoing reasons and those in Marvell's Opening Brief, Marvell respectfully requests that the Court (1) adopt Marvell's proposed constructions for the remaining terms; and (2) find that the "is to" claims of the '197 Patent are indefinite and therefore invalid.

15

DATED: June 15, 2026               Respectfully submitted,


/s/ *Karineh Khachatourian*

Karineh Khachatourian
David Xue
Trevor Giampaoli
Amanda Ogata
Haley Sinfield
**KXT LAW, LLP**
1775 Woodside Road, Suite 204
Redwood City, California 94061
Telephone: 650-239-0420
Fax: 650-249-5013

Jennifer P. Ainsworth
TX State Bar No. 00784720
jainsworth@wilsonlawfirm.com
**WILSON, ROBERTSON &**
**VANDEVENTER, P.C.**
909 ESE Loop 323, Suite 400
Tyler, Texas 75701
Telephone: 903-509-5000
Fax: 903-509-5091

Attorneys for Defendant,
Marvell Technology, Inc.

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on June 15, 2026, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

/s/ *Jennifer P. Ainsworth*

Jennifer P. Ainsworth
