# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

DAEDALUS PRIME LLC,

v.                                        Case No. 7:25-cv-00313-DC-DTG

GOOGLE, LLC.

## CLAIM CONSTRUCTION ORDER AND MEMORANDUM

Before this Court are the Parties' claim construction briefs: Google's Opening Claim Construction Brief (Dkt. No. 65), Daedalus's Responsive Claim Construction Brief (Dkt. No. 69), Google's Reply Construction Brief (Dkt. No. 72), and Daedalus's Sur-reply Claim Construction Brief (Dkt. No. 73).

Daedalus asserts U.S. Patent No. 8,775,833; U.S. Patent No. 8,898,494; U.S. Patent No. 10,372,197; and U.S. Patent No. 11,507,167. These asserted patents are directed to aspects of computer-processor design and power management. At a high level, they concern multicore processor architecture, dynamic allocation or balancing of power among processor components, and techniques for selecting power-management settings based on energy-performance bias and workload-configuration inputs.

## I. LEGAL PRINCIPLES

### A. General Principles

The general rule governing claim construction is that each claim term is construed according to its plain-and-ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), vacated on other grounds, 575 U.S. 959, 959 (2015) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (internal

- 1 -

quotation omitted). The plain-and-ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

There are two exceptions to the general rule that claim terms are construed according to their plain-and-ordinary meaning. The first is when the patentee acts as its own lexicographer. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The second is when the patentee disavows the full scope of the claim term either in the specification or during prosecution. *Id*. The Federal Circuit has counseled that "[t]he standards for finding lexicography and disavowal are exacting." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). To act as its own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent" to define the term. *Thorner*, 669 F.3d at 1365.

Courts generally rely on a hierarchy of evidence for claim construction. Courts start construction by viewing the terms as they are used in the specification and claims. *Phillips*, 415 F.3d at 1314–15. When reviewing the specification, however, courts must guard against incorporating examples and embodiments into the claims. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988). Next comes the prosecution history, which can provide evidence of how the patentee and the examiner understood the claim. *Phillips*, 415 F.3d at 1317. When reviewing the prosecution history, prosecution disclaimer may preclude a patentee from recapturing a specific meaning that was clearly and unmistakably disclaimed during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323–26 (Fed. Cir. 2003). Finally, Courts might look to extrinsic evidence such as technical dictionaries and expert testimony, but it is "less significant than the intrinsic record in determining 'the legally operative

meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).

A construction of "plain and ordinary meaning" may be inadequate when a term has more than one "ordinary" meaning or when reliance on a term's "ordinary" meaning does not resolve the parties' dispute. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). In that case, the Court must describe what the plain-and-ordinary meaning is. *Id.*

## B. Indefiniteness

"[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112(b). A claim, when viewed considering the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim is invalid as indefinite. *Id.* at 901. The indefiniteness inquiry is based upon the "understanding of a skilled artisan at the time of the patent application." *Id.* at 911. Indefiniteness requires clear-and-convincing evidence. *Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.,* 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## II. DISPUTED CLAIM TERMS

The parties agree to the construction of one term—"domain"—and dispute the construction of several terms. The Court sees no reason to deviate from the parties' agreed construction and approves the parties' agreed construction, which is are included at the end of this Order. The parties dispute the construction of several other terms, and the Court turns to those disputes.

## A. "interface unit" — U.S. Patent No. 11,507,167, claim 21

| Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "interface unit" | "Circuitry of a multicore processor that interconnects the cores to other circuitry" | Plain and ordinary meaning |

### 1. The Parties' Positions

Google contends claim 21 places the interface unit within the claimed multicore processor architecture because the claim recites that the first and second pluralities of cores are coupled to an interface unit, and because the surrounding claims are directed to the structure of a multicore processor. Dkt. No. 65 at 7–8. Google further argues that the specification confirms this architecture by describing an "interface unit" or "bus interface unit" that enables interconnection to additional circuitry of the processor. *Id*. at 8–10.

Daedalus responds that the claim language does not impose Google's location limitation. According to Daedalus, claim 21 merely recites that the cores are "coupled to" an interface unit, and "coupled to" does not require that the interface unit be on-chip or part of the multicore processor. *Id*. at 4–6. Daedalus further argues that Google improperly imports a preferred embodiment from Figure 7, and that the specification uses "interface," "interface unit," and "interconnect" broadly rather than as limited to Google's proposed internal-processor circuitry. *Id*. at 6–7.

In reply, Google argues the dispute "reduces to whether the claimed 'interface unit' must be part of the multicore processor or can be located anywhere, including off-chip." Dkt. No. 72 at 1. Google clarifies that it does not contend the cores must be directly connected to the interface unit; rather, Google contends that the interface unit, like the other recited structures, is

- 4 -

included in the claimed processor. *Id*. at 1–2. Google also argues that Daedalus improperly blurs distinct uses of "interface unit," "interface," and "interconnect." *Id*.

Daedalus responds in sur-reply that Google has created a "geographic binary" not found in claim 21. Dkt. No. 73 at 1. Daedalus argues that claim 21 describes a relationship, not a location, and that Figure 7 does not support Google's construction because Figure 7 shows two interface units—one inside each core unit—whereas claim 21 recites a singular "interface unit" coupled to both pluralities of cores. *Id*. at 1–2. Daedalus further argues that Google cites no authority for the proposition that reciting a component in an apparatus claim necessarily makes that component part of the apparatus. *Id*. at 2–3.

### 2. The Court's Analysis

The threshold issue is whether claim 21's phrase "coupled to an interface unit" imposes a location requirement that the "interface unit" be part of the multicore processor. The Court concludes that it does not.

Claim 21 recites: "wherein the first plurality of cores and second plurality of cores are further coupled to an interface unit." '167 patent at claim 21. The operative language is "coupled to." That phrase describes a relationship between the first and second pluralities of cores and the interface unit. It does not specify where the interface unit must be located. Nothing in claim 21 requires that the interface unit be "within" the multicore processor, "on-chip," "internal," "part of" the core units, or "circuitry of" the multicore processor. Google's construction therefore adds a location requirement not found in the claim.

The surrounding claim language reinforces that conclusion. Independent claim 14 recites a "multicore processor" comprising a first unit including a first plurality of cores, a second unit including a second plurality of cores, a fabric coupling the pluralities of cores, and a system

agent configured to control operating levels of the cores. Claim 20 further recites that the first and second pluralities of cores are coupled to "a plurality of units of a last level cache (LLC)." Claim 21 then adds that those same pluralities of cores are "further coupled to an interface unit." '167 patent at claims 14, 20–21. This language tells a skilled artisan what is coupled to what. It does not transform the interface unit into a necessarily co-located component of the multicore processor.

Google's contrary argument depends primarily on specification embodiments. Google points to the specification's statement that "each core unit may include multiple cores, a cache memory, an interface unit and so forth," and to the Figure 7 embodiment, where "each core unit 510 includes an interface 515 such as a bus interface unit to enable interconnection to additional circuitry of the processor." '167 patent at 2:57–58, 11:43–46. Those passages show that an interface or interface unit may be included within a core unit in a disclosed embodiment. But permissive embodiment language does not define the claim scope. The specification uses "may," and the relevant figures are described as embodiments. The Court will not import that embodiment-specific location limitation into claim 21.

Figure 7 also illustrates the problem with Google's proposed construction. Figure 7 depicts separate core units, and the specification explains that "each core unit 510 includes an interface 515 such as a bus interface unit." '167 patent at 11:43–46. Claim 21, however, recites a singular "interface unit" coupled to both the first plurality of cores and the second plurality of cores.'167 patent at claim 21. That mismatch makes Figure 7 a poor basis for limiting claim 21 to Google's proposed architecture. At most, Figure 7 shows one way an interface may be implemented. It does not define "interface unit" as "circuitry of a multicore processor."

The specification also uses interface-related terminology broadly. It refers to an input/output interface, a PCIe interface, a dedicated interface between the PCU and an external voltage regulator, an interface between the PCU and other processor components, interfaces to off-chip devices, point-to-point interfaces, and an interface between a chipset and graphics engine. *See, e.g.,* Dkt. No. 69 at 5 n.1 (collecting citations of various interfaces). That breadth does not mean every use of "interface" is identical. But it does undermine Google's effort to derive a rigid co-location requirement from selected embodiments.

Google's reply reframes the dispute as whether the interface unit may be "located anywhere, including off-chip." Dkt. No. 72 at 1. But the claim itself supplies the relevant limitation: the first and second pluralities of cores must be "coupled to" the interface unit. The Court need not choose between Google's co-location requirement and an unlimited geographic abstraction. The claim requires coupling. It does not require co-location. Accordingly, the Court rejects Google's proposed construction. The "interface unit" will be given its plain and ordinary meaning.

**B. "energy performance bias (EPB) value" — U.S. Patent No. 10,372,197, claims 1–6, 8–16, 18**

| Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "energy performance bias (EPB) value" | "A value indicating a user's preference for a tradeoff between power optimization and performance optimization" | Plain and ordinary meaning; alternatively, "a value influencing a tradeoff between power optimization and performance optimization" |

**1. The Parties' Positions**

Google argued that the specification repeatedly describes the EPB as a high-level input from an end user indicating a power-to-performance tradeoff preference, and that the invention's purpose is to provide a simple way for a user to control otherwise complex power-management

settings. Dkt. No. 65 at 11–13. Google also relied on prosecution history, arguing that the applicant distinguished the claims by explaining that an EPB value allows an end user to control power-to--performance tradeoffs in a simple manner. *Id*. at 13–14. Google further argued that Intel extrinsic evidence and inventor materials support the same understanding. *Id.* at 14–16.

Daedalus responds that Google's construction improperly adds two limitations: "user's preference" and "power savings." *Id*. at 7–8. Daedalus argues that claims 1 and 15 do not require the EPB value to originate from or indicate a human user's preference, while claim 11 expressly recites "a preference of a user," creating a claim-differentiation problem for Google. *Id*. at 8–10. Daedalus also argues that the specification expressly allows EPB values to come from an OS, BIOS, BMC, data-center software, or automatically, and even states that an end user may be prevented from individual control. *Id*. at 9–10. Daedalus further argues that the '197 patent uses "power optimization," not merely "power savings." *Id*. at 10–11.

In reply, Google revised its construction to use Daedalus's "power optimization" language, proposing: "A value indicating a user's preference for a tradeoff between power optimization and performance optimization." Dkt. No. 72 at 5. Google argues that EPB value is a coined term with no accepted plain meaning, and that Daedalus's construction merely rearranges words and would sweep in any parameter affecting power or performance. *Id*. at 2–3. Google also clarifies that its construction does not require the EPB value to come directly from a user; rather, Google contends that software, BIOS, or another entity may convey the EPB value so long as the value expresses a user's preference. *Id*. at 3–4, 6.

Daedalus responds in sur-reply that the remaining dispute is whether the EPB value must indicate "a user's preference." Dkt. No. 73 at 3. Daedalus argues that the claim text forecloses Google's limitation because claim 11 expressly recites user preference, while claims 1 and 15 do

- 8 -

not. *Id*. Daedalus further argues that claims 9 and 13 identify non-user sources: claim 9 recites receipt of an EPB value from a baseboard management controller, and claim 13 recites an interface enabling "a user, an operating system or a baseboard management controller" to set the EPB value. *Id*. at 3–5. Daedalus also argues that Google's own extrinsic evidence refers to software programming the EPB register using "whatever criteria" the software sees fit, which Daedalus says is not necessarily a user preference. *Id*. at 6–7.

The Parties argued this term at the Claim Construction Hearing. There, among other things, Google emphasized that the '197 Patent's title ("User Level Control of Power Management Policies") supports its construction. Google also characterized claim 13 as allowing an interface to set the EPB, as opposed to restricting the EPB initially. Further, Google asked the Court to review *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312 (Fed. Cir. 2016). Daedalus emphasized the difference in claim language supported its constructions.

### 2. The Court's Analysis

The Court rejects Google's proposed "user's preference" limitation. Google has dropped its "power savings" wording, leaving the question whether the EPB value must indicate a user preference (or "influence" a power/performance tradeoff). Although the specification describes EPB as a user-facing abstraction that can allow an end user to control power-to-performance tradeoffs through a single input, those passages do not amount to lexicography or disavowal.

The claim language pushes towards Daedalus's plain-and-ordinary-meaning construction, as further defined below. Claim 11 of the '197 patent expressly requires the EPB value to indicate "a preference of a user," while independent claims 1 and 15 do not. Claims 9 and 13 further recite non-user sources of the EPB value, including a baseboard management controller and a value-setting interface for "a user, an operating system or a baseboard management

controller." Google's construction would eliminate those alternatives by requiring the operating system and baseboard management controller to convey a user preference even though the claims do not say that. And, despite Google's contrary argument (e.g., Dkt. No. 72 at 4), other independent claims can inform the claim scope of terms in different independent claims. *See AllVoice Computing PLC v. Nuance Comms., Inc.*, 504 F.3d 1236 (Fed. Cir. 2007) (claim differentiation may apply when a proposed construction would render different language in *another* independent claim superfluous).

The specification likewise states that EPB values may be provided by an operating system, BIOS, BMC, data-center management software, or other entities "automatically *or* via a user," and further states that the end user may be prevented from individual control. '197 patent at 2:53–61. Google's reply does not adequately account for that non-user source language. Dkt. No. 72 at 3–5.

The prosecution history is also not limiting. The prosecution history may confirm that user control is an important benefit of the EPB value, but it does not clearly require every EPB value to indicate a user preference. Here, Google relies on the applicant's statement—made in response to a § 101 rejection[1]—that the specification describes an EPB value as allowing an end user to control power-versus-performance tradeoffs in a simple manner, including where a non-technical user has little or no understanding of how to tune the underlying features. Dkt. No. 65 at 13–14; Dkt. No. 72 at 5–6. Those statements may inform the Court's understanding of the invention's user-facing benefits. But they do not clearly state that every EPB value in every claim must indicate a user preference. The statements discuss embodiments and benefits of the

---

[1] Daedalus takes the position that § 101 arguments, based on PTAB authority, do not inform claim construction. Dkt. No. 73 at 6. The Court is not aware of any binding authority supporting that assertion.

EPB value in the context of overcoming an abstract-idea rejection; they do not surrender EPB values provided automatically by an OS, BIOS, BMC, or management software—the sources the specification and claims identify.

Further, Google's Intel-sourced extrinsic evidence is consistent with Daedalus's plain-and-ordinary-meaning construction. The Intel Software Developer's Manual, for example, states that "software can use whatever criteria it sees fit" to program the value IA32_ENERGY_PERF_BIAS—which the parties seem to equate to an "EPB value." Ex. I at 5. "Whatever criteria" is broader than a user's preference. Similarly, an Intel engineer described the feature as "allow[ing] software to convey *its* policy." Ex. G (GOOG-DPRIME-PA-00000163) (emphasis added). The Intel engineer's discussion indicates that software, not necessarily a user, sets the policy. That extrinsic discussion is in tension with mandating—in all instances—that a user's preference must be captured by the EPB value.

Google's reliance on *Howmedica* at the hearing does not change the result. *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312 (Fed. Cir. 2016). *Howmedica* confirms the general proposition that the written description may resolve claim-construction disputes, and that claim differentiation is a guide rather than a rigid rule. *Id*. at 1323. In resolving location-based claim construction dispute, the Federal Circuit looked to the written description because the patent disclosed only one way to satisfy that requirement: every relevant description and figure placed the recess "essentially midway" along the taper. *Id*. at 1321. There, the written description offered "no other suggestion" for how the recess and taper should be located to satisfy the claim language. *Id*. But as discussed above, the claims and specification provide non-user-sourced EPB values (and instances where the user is carved-out from control). Thus, the Court does not read

- 11 -

*Howmedica* to overcome the claim language here or to justify importing a mandatory "user's preference" limitation into every instance of EPB value.

Accordingly, the Court construes "energy performance bias (EPB) value" according to its plain and ordinary meaning—"a value indicating a tradeoff between power optimization and performance optimization"—and rejects Google's extraneous user preference requirement. Instead of Daedalus's proposal of "influencing," the Court uses "indicating," as that term is used within the claim language and specification of the '197 patent.

**C. "workload configuration input" / "workload configuration value" — U.S. Patent No. 10,372,197, claims 1–2, 15**

| Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "workload configuration input" / "workload configuration value" | "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g., NUMA, UMA, I/O intensive)" | No construction necessary |

**1. The Parties' Positions**

Google argues that "workload configuration input" and "workload configuration value" require construction because Daedalus's non-construction would not resolve the parties' dispute over claim scope. Dkt. No. 65 at 16. Google relies on claim 15, which states that the "workload configuration value" is "to indicate a predominant workload type to be executed on the system." *Id*. Google also relies on the specification's discussion of a workload configuration input as an additional input to a tuning table, with examples including NUMA, UMA, and I/O-intensive workloads. *Id*. at 17–19. According to Google, the term refers to a value indicating a predominant pattern of execution with particular hardware configuration demands, not merely any generic power-management preference. *Id*. at 18–19.

- 12 -

Daedalus responds that no construction is necessary because the terms have readily understandable meanings: an input or value relating to the configuration of a workload. Dkt. No. 69 at 14–15. Daedalus argues that Google improperly imports language from claim 15 into claim 1, even though claim 1 recites "workload configuration input" and claim 15 recites "workload configuration value." *Id*. at 15. Daedalus further argues that the specification's NUMA, UMA, and I/O-intensive examples are expressly introduced as examples and followed by "etc.," making them non-limiting. *Id*. at 15–17.

In reply, Google argues that the terms are coined and lack commonly accepted meanings, so the specification must inform their construction. Dkt. No. 72 at 6–7. Google contends that the specification ties the terms to a specific function: selecting tuning settings through a table, in combination with the EPB value, based on workload configurations. *Id*. at 6–7. Google also argues that Daedalus's approach would sweep in virtually any parameter with some connection to a workload. *Id*. at 7.

Daedalus responds in sur-reply that claim 1 and claim 15 already supply the necessary boundaries. Dkt. No. 73 at 7–8. Per Daedalus, claim 1 recites a workload configuration input "regarding a workload," while claim 15 recites that the workload configuration value indicates "a predominant workload type to be executed on the system." *Id*. at 7. Daedalus argues that Google's "predominant pattern of execution with particular hardware configuration demands" language appears nowhere in the claims and imports a gloss from exemplary embodiments. *Id*. at 7–9.

The Parties argued this term at the Claim Construction Hearing.

## 2.   The Court's Analysis

The Court rejects Google's proposed construction. The claim language and specification support understanding these terms according to their plain meaning in context. Google, however, identifies a legitimate distinction between a workload-configuration input and a generic power-management preference, but its proposed construction goes beyond that distinction by replacing the claim language with a narrower formulation not found in the claims.

The '197 patent states, "in addition to the EPB input, a workload configuration input can be provided," and that a tuning table may have three dimensions so that, "based on the workload configuration input, a different set of entries for the defined power management features can be accessed . . . ." '197 patent at 6:61–7:3. The same paragraph explains that the input allows a sophisticated or "vertical" user with knowledge of the workloads running on the system to obtain "well-tuned settings," and gives examples of configured workload inputs such as NUMA, UMA, and I/O-intensive workloads. *Id*. at 6:61–7:14.

To be sure, that intrinsic evidence gives Google some support. The '197 claim terms do not appear to describe *any* value that has any relationship to workload. But Google's proposed construction does not stop there. It would require "a predominant pattern of execution with particular hardware configuration demands." Dkt. No. 65 at 16. Yet the phrase "particular hardware configuration demands" does not appear in the claim language or the specification.

Claim 1 recites a tuning circuit to receive "a workload configuration input regarding a workload." Claim 15 recites a "workload configuration value," and then supplies its own explanatory limitation: "wherein the workload configuration value is to indicate a predominant workload type to be executed on the system." That claim language is materially different from Google's proposal. "Regarding a workload" and "predominant workload type" are the patentee's

words. "Predominant pattern of execution with particular hardware configuration demands" are Google's. The Court does not find sufficient support in the intrinsic record to substitute Google's seemingly narrower language for the claim language.

For claim 15, Google's construction risks doing more than clarifying the term. It rewrites "predominant workload type" into "predominant pattern of execution with particular hardware configuration demands." The latter phrase may describe some disclosed examples, but it is not the language the patentee used in claim 15. Thus, the Court declines to re-write the claim language as Google proposes.

Further, the Court rejects the inclusion of Google's admittedly non-limiting examples: "(e.g., NUMA, UMA, I/O intensive)." While consistent with the specification and the plain and ordinary, the Court's preference is to avoid creating unintentional ambiguity and declines to include non-limiting examples in claim constructions. Accordingly, the Court adopts the plain and ordinary meaning for this term.

## D. "dynamically tune power allocation" / "dynamically balancing power" — U.S. Patent No. 8,898,494, claims 1–2, 8–9, 12, 16

| Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "dynamically tune power allocation" / "dynamically balancing power" | "Adaptively increasing power for one component while concurrently reducing power to another component" | Plain and ordinary meaning |

### 1. The Parties' Positions

Google argues that these related terms refer to a system that adapts to changing performance demands by redistributing power among components—that is, increasing power to one component while reducing power to another. Dkt. No. 65 at 19–20. Google relies on the specification's description of allocating more current (or frequency) to a component determined

- 15 -

to be a bottleneck while a competing device is capped or limited. *Id*. at 20. Google also relies on Daedalus's prior IPR statements and PTAB descriptions of the '494 patent, arguing that the intrinsic record consistently describes the invention as increasing resources to one component while reducing resources to another to stay within a power limit. *Id*. at 20–22. Google further argues that the specification uses "balancing" and "allocation" interchangeably. *Id*. at 22–24.

Daedalus responds that the claims do not require either of Google's restrictions: concurrency or a mandatory increase-decrease pair. Dkt. No. 69 at 17–20. Daedalus argues that claim 1 recites operation "based on a power limit," not operation "at" the power limit, while dependent claim 3 expressly recites "operating at the power limit." *Id*. at 18–19. Daedalus also argues that claim 8 recites "adjusting" frequencies without requiring any directionality or simultaneous opposing movement. *Id*. at 19. Daedalus further argues that the specification contradicts Google's construction because it describes circumstances where an increase in performance may not include a counterbalancing reduction, where freed power may be saved for later, and where one component may be held constant while another is increased. *Id*. at 20–22.

In reply, Google argues that Daedalus's own statements, the specification, and the PTAB record all point to the same core concept: improving performance within power constraints by allocating more power to one component while reducing power to another. Dkt. No. 72 at 7–9. In exhibits added in reply, Google argues that Daedalus previously distinguished prior art before the PTAB by explaining that the claims require allocating extra resources to the device needing them while other devices are reduced in performance to meet a power limit. *Id*. at 8. Google also argues that the examiner understood "dynamically tune power allocation" consistently with Google's construction. *Id*. at 9. Google further contends that its construction does not read out

embodiments that include one-way adjustments in addition to counterbalancing adjustments. *Id*. at 9–11.

Daedalus responds in sur-reply that Google's disclaimer theory fails because the PTAB did not adopt Daedalus's POPR statements and instead granted institution. Dkt. No. 73 at 9–10. Daedalus also argues that Google's reliance on POPR pages 11 and 30 is new on reply and, in any event, those statements distinguished specific prior-art configurations rather than clearly surrendering all non-counterbalancing embodiments. Dkt. No. 73 at 10. Daedalus further argues that Google does not address the specification's distinction between at-limit and not-at-limit scenarios, including the statement that when the IC is not up against a power limit, an increase in performance may not include a counterbalancing reduction. *Id*. at 10–11. Daedalus also argues that Google's concession that counterbalancing occurs only in some circumstances is inconsistent with a construction requiring counterbalancing every time. Dkt. 73 at 11.

## 2. The Court's Analysis

The specification does not support Google's proposed construction—increasing power for one component while concurrently reducing power to another component is not mandated in every claim. Although the '494 patent describes embodiments in which one component receives additional power or frequency while another component is capped or reduced, those embodiments arise principally when the integrated circuit is operating at or near a limit. The specification expressly distinguishes not-at-limit operation, stating that "when a power limit exists and IC 100 is not up against the power limit, the immediately aforementioned increase in performance may not include a counterbalancing reduction in the other device." '494 patent at 8:30–33.

Google's reply does not squarely address that passage. Instead, Google argues that the cited embodiments contemplate counterbalancing "in at least some circumstances." Dkt. No. 72 at

10. True, but Google's construction requires counterbalancing in *every* instance. The specification also discloses power-saving or banking embodiments in which freed power "may be saved to increase energy efficiency" or used later, rather than concurrently transferred to another component. '494 patent at 19:36–43. And the specification uses "balancing" and "allocation" as related but distinct concepts, describing "balanc[ing] and allocat[ing] power/frequency" together and treating "tuning allocation" as one way to implement broader workload-based balancing. '494 patent at 7:40–47, 10:6–21.

The Court also does not find that Daedalus clearly and unmistakably disclaimed claim scope at the US Patent Office. Instead, Google's cited statements are more generalized, illustrative narratives of the '494 patent—and are not sufficiently clear to limit claim scope. Daedalus's IPR statements, for example, distinguished prior-art systems that adjusted multiple components uniformly or in the same direction; those statements do not clearly require that every covered embodiment increase power to one component while concurrently reducing power to another. Ex. P at 11, 30. Nor do the PTAB's background descriptions of the '494 patent or the examiner's provisional double-patenting discussion amount to a limiting construction adopted as a condition of patentability. Ex. L at 4; Ex. M at 3–4; Ex. K at 3–4; Ex. N at 7, 9–10. The cited materials may inform the Court's understanding that the patent frequently describes dynamic tuning in terms of redistributing power among components, but they do not establish the clear and unmistakable surrender required for prosecution disclaimer.

At bottom, the Court resolves the dispute between the parties as presented in the briefing. The Court adopts the plain and ordinary meaning for these terms. The Court therefore declines to adopt Google's construction, which would render superfluous distinct claim language into a mandatory one-up-to-one-down requirement. The Court does not interpret this claim term to

require every increase in power for one component to include reducing power to another component.

**E.   E. "is to" — U.S. Patent No. 8,775,833, claims 15–18; U.S. Patent No. 10,372,197, claims 2–3, 5–7, 9–10, 15–16, 18–20**

| Term | Google's Position | Daedalus's Position |
|---|---|---|
| "is to" | Indefinite | Not indefinite |

**1.      The Parties' Arguments**

Google argues that the "is to" clauses render the challenged apparatus/system claims indefinite because they impermissibly mix apparatus and method claiming. Dkt. No. 65 at 24–27. Google points, for example, to claim 15 of the '833 patent, which recites that "the power sharing logic is to dynamically allocate" portions of a power budget, and to claim 2 of the '197 patent, which recites that the processor's "power controller is to access" a power-performance tuning table. *Id*. at 24–26. Google argues that "is to" is not familiar capability language such as "configured to" or "adapted to," but instead reads as an operational requirement, creating uncertainty about whether infringement occurs when the apparatus is made (or sold) or only when it performs the recited acts. *Id*. at 25–27 (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)).

Daedalus responds that "is to" is common functional language describing the capability of a structural component, no different in substance from "configured to," "adapted to," or Federal Circuit-approved active-verb formulations such as "presents," "receives," and "generates." Dkt. No. at 25–30. Daedalus argues that *IPXL* does not apply because the claims do not require human user action but instead describe what processor components can do. *Id*. at 25– 26. Daedalus relies on *MasterMine*, *Microprocessor Enhancement*, *UltimatePointer*, and related cases upholding apparatus claims with functional language. *Id*. at 26–30.

- 19 -

In reply, Google argues that the hybrid-claim rule is not limited to human-user actions and that automated device operations can still render apparatus claims indefinite if the claim recites method steps. Dkt. No. 72 at 12–14. Google also argues that Daedalus's capability cases are distinguishable because the claims here do not use recognized capability language such as "configured to," "adapted to," or "capable of." *Id*. at 14–15. Google contends that ordinary usage of "is to," as in "the committee is to review the proposal," denotes an act that will or must occur, not merely an unexercised capability. *Id*.

Daedalus responds in sur-reply that *MasterMine* controls because the challenged claims recite a named structure followed by the function that structure is arranged to perform. Dkt. No. 73 at 13–15. Daedalus argues that each challenged limitation follows that architecture, such as "the power sharing logic is to dynamically allocate," "the power controller is to access," and "the tuning circuit is to update." *Id*. at 13. Daedalus further argues that Google relegates *MasterMine*, *Microprocessor Enhancement*, and *UltimatePointer* to a footnote and incorrectly focuses on the absence of identical "is to" wording rather than the functional-claiming architecture those cases approve. *Id*. at 13–15.

## 2. Court's Analysis

The parties' dispute concerns the rule sometimes associated with *IPXL*. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). There, a claim may be indefinite if it claims both an apparatus and a method of using that apparatus—creating uncertainty about whether infringement occurs when the apparatus is made or sold, or only when a user or other actor performs the recited method steps. *Id*. at 1384. The system claim at-issue in *IPXL* recited system components but then required that "the user uses the input means." *Id*. The

- 20 -

Federal Circuit held the claim indefinite because it was unclear whether infringement occurred upon creation of the system or upon a user's later use of it. *Id*.

But the *IPXL* rule is not a prohibition on functional language in apparatus claims—the Federal Circuit has repeatedly recognized that apparatus claims may use functional language to describe the capabilities of claimed structure. In *Microprocessor Enhancement*, the Federal Circuit held that an apparatus claim was not indefinite because it was "clearly limited to a pipelined processor possessing the recited structure and capable of performing the recited functions." *Microprocessor Enhancement Corp. v. Tex. Instruments Inc*., 520 F.3d 1367, 1375 (Fed. Cir. 2008). *UltimatePointer* likewise held that apparatus claims were not indefinite where the "image sensor generating data" language reflected the capability of the claimed structure, not a separate method step or user activity. *UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 827 (Fed. Cir. 2016). Similarly, *MasterMine* found apparatus claims are "not necessarily indefinite for using functional language," and claims reciting a reporting module that "presents," "receives," and "generates" used permissible functional language to describe the capabilities of the claimed system. *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315 (Fed. Cir. 2017).

The Court finds those cases control the analysis here. The challenged claims do not recite a user action like "the user uses" in *IPXL*, "callers digitally enter data" in *Katz*, or a user completes a transaction in *H-W Technology*. *Katz* found indefiniteness where system claims recited actions performed by individual callers, including that callers "digitally enter data," because the claims were directed to both systems and actions performed by callers. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) ("Like the language used in the claim at issue in *IPXL* ('wherein ... the user uses'), the language used in

- 21 -

Katz's claims ('wherein ... callers digitally enter data' and 'wherein ... callers provide ... data') is directed to user actions, not system capabilities"). *H-W Technology* likewise found an apparatus claim indefinite where a tangible computer-readable medium claim included method limitations describing a user's completion of a transaction and selection of an associated offer. *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1336 (Fed. Cir. 2014) ("Here, the disputed language ('wherein said user completes ...' and 'wherein said user selects ...') is nearly identical to the disputed language in [*IPXL* and *Katz*].". Those claims are not akin to those before the Court.

Here, the challenged limitations identify a structure and then state what that structure "is to" do. The claims, for example, recite formulations such as "the power sharing logic is to dynamically allocate," "the power controller is to access," "the tuning circuit is to update," and "the processor is to receive," and "the power sharing logic is to dynamically allocate substantially all of the variable power budget to the first domain for a first workload." *See, e.g.*, claim 15 of the '833 patent; *see also* Dkt. No. 65 at 24–25; Dkt. No. 73 at 13–14. That structure-plus-function formulation is the ordinary architecture of functional apparatus claiming.

Google's response is that "is to" is not the same phrase as "configured to," "adapted to," or "capable of." Dkt. No. 72 at 14–15. But the Court's reading of the caselaw does not impose a magic-words requirement. *MasterMine* upheld active verbs such as "presents," "receives," and "generates" when tied to claimed structure. *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315 (Fed. Cir. 2017) ("Though claim 8 includes active verbs—presents, receives, and generates—these verbs represent permissible functional language used to describe capabilities of the 'reporting module.'"). *UltimatePointer* upheld "generating data" language tied to an image sensor. *UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 827 (Fed. Cir. 2016) ("Unlike *IPXL* and similar cases, the claims at issue here make clear that the 'generating

- 22 -

data' limitation reflects the capability of that structure rather than the activities of the user."). And *Microprocessor Enhancement* upheld functional language describing a processor capable of performing the recited functions. *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (at-issue claim was "limited to a pipelined processor possessing the recited structure and *capable* of performing the recited functions, and is thus not indefinite under *IPXL Holdings*.") (emphasis in original). The absence of the specific words "configured to" does not transform structure-linked functional language into a method step.

Google, however, is correct that *IPXL*-type indefiniteness is not categorically limited to human-user actions as *Daedalus* suggests. *Rembrandt* held indefinite a claim reciting apparatus elements followed by "transmitting the trellis encoded frames," even though the transmitting step was performed by the claimed data-transmitting device. *Rembrandt Data Technologies, LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011). *Courtesy Products* similarly found hybrid claiming where system claims recited apparatus structure and operational use of the brewing machine, including "the brewing machine heating water." *Courtesy Products, L.L.C. v. Hamilton Beach Brands, Inc.*, No. 13-2012, 2015 WL 7295436, at *5 (D. Del. Nov. 18, 2015). The claims here instead use the recurring formulation "[identified structure] is to [perform function]." That formulation is closer to *MasterMine*, *Microprocessor Enhancement*, and *UltimatePointer* than to *IPXL* or *Rembrandt*.

Moreover, ordinary English usage of "is to" does not compel indefiniteness. Google argues that phrases such as "the committee is to review the proposal" denote a required future act, not capability. Dkt. No. 72 at 14–15. But patent claims are read in their technical and claim-drafting context, not in isolation from the surrounding claim language. In that context, "the power controller is to access" and "the tuning circuit is to update" describe what the claimed

- 23 -

controller or circuit is configured, arranged, or capable of doing. Thus, Google has not carried its burden to prove indefiniteness.

Accordingly, the Court concludes that Google has not shown that the challenged "is to" limitations render the claims indefinite. The claims are best understood as apparatus or system claims that use functional language to describe the capabilities or configuration of identified structures. The Court therefore rejects Google's indefiniteness challenge.

## III.   CONCLUSION

Finally, the Court appreciates the quality of the parties' claim-construction briefing and their preparation for the claim-construction hearing. The parties' submissions were thorough, focused, and helpful to the Court's understanding of the disputed technology and claim language. The Court also appreciates that counsel presented their disputes professionally, without unnecessary rhetoric or denigration of the opposing side. The parties' preparation was readily apparent at the hearing and assisted the Court in resolving the disputed terms. Put frankly, the Court wishes more litigants would follow the example set by the parties' advocacy here.

Based on the above analysis, the Court adopts the following final claim constructions:

| Term | Court's Final Construction |
|---|---|
| "domain"<br><br>'833 patent | "a collection of hardware and/or logic that operates at the same voltage and frequency point" |
| "interface unit"<br><br>'167 patent, claim 21 | Plain and ordinary meaning |
| "energy performance bias (EPB) value"<br><br>'197 patent, claims 1–6, 8–16, 18 | Plain and ordinary meaning, which means a value indicating a tradeoff between power optimization and performance optimization and not limited to a user's preference. |
| "workload configuration input" / "workload configuration value"<br><br>'197 patent, claims 1–2, 15 | Plain and ordinary meaning |
| "dynamically tune power allocation" / "dynamically balancing power"<br><br>'494 patent, claims 1–2, 8–9, 12, 16 | Plain and ordinary meaning, which does not require every increase in power for one component to include reducing power to another component. |
| "is to"<br><br>'833 patent, claims 15–18;<br>'197 patent, claims 2–3, 5–7, 9–10, 15–16, 18–20 | Not indefinite |

**SIGNED** this 20th day of July, 2026.

DEREK T. GILLILAND
UNITED STATES MAGISTRATE JUDGE